**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES ex rel. BERNARD LISITZA, et al., ) ) ) Plaintiffs, ) ) v. ) ) PAR PHARMACEUTICAL COMPANIES, INC., ALPHAPHARM PTY LTD., and GENPHARM ULC., ) ) ) ) Defendants. ) | No. 06 C 06131 Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

This case involves an alleged prescription-switching scheme whereby defendant Par Pharmaceutical Companies, allegedly under the direction and control of defendants Alphapharm and Genpharm, caused pharmacies to submit false claims to avoid Medicaid reimbursement caps, resulting in overpayment by the federal and various states governments. The claims are brought as a *qui tam* action under the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), and parallel state statutes, by Bernard Lisitza, the relator.[1] Related claims against the pharmacies involved have ended in settlement. *See, e.g.*, *United States ex rel. Lisitza v. CVS Corp.*, No. 03 C 00742; *United States ex rel. Lisitza v. Omnicare*, No. 01 C 00743; *United States ex rel. Lisitza v. Walgreens Co.*, No. 03 C 00744. The alleged false claims consist of the pharmacies' certifications, as a condition of Medicaid reimbursement, that they complied with all applicable federal and state laws when they had illegally substituted the form (*e.g.* capsule or tablet) or

---

[1] The United States has exercised its right to intervene against Par but not against Alphapharm and Genpharm.

dosage of certain drugs for those prescribed not for a medically necessary reason but in order to avoid the reimbursement caps and in violation of regulations requiring cost efficiency.

The defendants are alleged to have "caused" the submission of the false claims within the meaning of the FCA by marketing alternate drug forms and inducing the pharmacies to switch drug forms or dosages. Alphapharm and Genpharm, both foreign drug makers, move to dismiss the Second Amended Complaint (Dkt # 35) ("the complaint") as it pertains to them, arguing that Lisitza fails to state a claim for relief against them under the heightened standards for pleading fraud.[2] *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.")

In reviewing a motion to dismiss for failure to conform to Rule 9(b), as with any motion to dismiss, the Court accepts all the factual allegations in the complaint and draws all reasonable inferences from these facts in favor of the plaintiff. *Arazie v. Mullane*, 2 F.3d 1456, 1465 (7th Cir. 1993). Here, the complaint comprises 616 numbered paragraphs spanning more than 150 pages, as well as 54 exhibits totaling another 300 pages. Much of the complaint refers collectively to the "defendants" without differentiation. The prolixity of the complaint and its failure to distinguish between defendants makes it difficult to isolate the relevant allegations, but the Court attempts to summarize the key allegations against Alphapharm and Genpharm below.

A. **Facts**

During the relevant time period (approximately 2001-2005), Alphapharm, an Australian generic drug manufacturer, and Genpharm, a Canadian generic drug manufacturer and distributor, were affiliates commonly owned by Merck KGaA, which also owned a large stake in

---

[2] Defendant Par opted to answer the complaint and assert affirmative defenses (Dkt. # 160).

Par. In advance of the expiration of Eli Lilly's patent for Prozac in 2001, Alphapharm decided to develop and seek FDA approval for 10- and 20- milligram tablets of fluoxetine, the generic equivalent of Prozac.[3] 20-milligram tablets of Prozac had not been available before—Lilly made only capsules of that dosage (although it did make tablets in 10 milligram doses). Because Lilly was the only manufacturer of fluoxetine during the life of its patent, Medicaid regulations provided reimbursement caps only on the forms of the drug Lilly marketed—as relevant here, 20 mg. capsules. Alphapharm and Genpharm were aware of the Medicaid reimbursement caps on fluoxetine 20 mg. capsules and were aware that there was no such cap on 20 mg. tablets. They made the 20 mg. tablets in order to exploit this price difference. Once FDA approval was obtained, Alphapharm manufactured the tablets for distribution by Genpharm, which in turn sought a United States distributor.

Recognizing that they needed to "create a market" for their new product, Alphapharm and Genpharm desired an aggressive marketing campaign. Par was among the companies they considered using to market the drug, although there was skepticism about Par's ability to take on a venture of large scale. In advance of the launch of the generic fluoxetine tablets, Genpharm took on an increased role in Par's management. Genpharm's chairman took a seat on Par's board of directors, and Executive Vice President Ian Jacobson took a place in Par's Office of the President, a two-person managerial office that reported only to Par's CEO. Jacobson became the supervisor of Par's Sales & Marketing and Human Resources departments. Par considered

---

[3] The complaint covers drugs in addition to fluoxetine—ranitidine and buspirone—that were marketed by Par, but only fluoxetine was made or distributed by Alphapharm and Genpharm, and beyond very general allegations of Alphapharm and Genpharm's "control" of Par, there are no allegations of involvement by those two companies in false claims relating to those other drugs (The relator says only that "While Par was under Genpharm and Alphapharm's control and supervision, defendants used the same switching scheme for as they had for fluoxetine." Compl., Dkt. ¶¶ 13, 19, 180.) The Court therefore confines its discussion to fluoxetine.

Genpharm to be its de facto "owner." Par's sales force was expanded in order to handle the marketing of the fluoxetine tablets. Ultimately Genpharm contracted with Par for the exclusive rights to market fluoxetine tablets in the United States. In exchange, Genpharm would receive 42.5% of the gross profits.

Genpharm and Alphapharm wanted their product to be aggressively marketed by a distributor with enough "marketing muscle" to "create a market" for the tablets. At Genpharm and Alphapharm's direction and under their control, Par did embark on an aggressive marketing campaign to get the 20-mg fluoxetine tablets into the market. Par did so, the complaint alleges, by means of an illegal drug-switching scheme that would allow pharmacies to avert Medicaid caps by unlawfully filling prescriptions for capsules with tablets instead, without physician approval or a medical need for the swap, and in violation of regulations requiring cost efficiency. Lisitza also alleges that Par also offered illegal financial incentives to the pharmacies and made false statements about the legality of switching drug forms, the efficacy of the tablets compared to capsules, and other pertinent topics. Genpharm and Alphapharm, he maintains, knew about the scheme, referring to it as the "capsule-tablet dodge," and Genpharm controlled the marketing campaign. Both companies, Lisitza alleges, profited from the sales of fluoxetine tablets spurred by the fraudulent scheme.

### B. Discussion

A federal complaint must contain "a short and plain statement of the claim" that includes sufficient detail to "give the defendant fair notice of what the claim is and the grounds upon which it rests." Federal Rule of Civil Procedure 8(a)(2); *Bell Atl. v. Twombly*, 550 U.S. 544, 545 (2007). A complaint contains enough detail if it presents "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Twombly*, 550 U.S. at 570). The factual allegations "must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555.

As relevant to the relator's complaint, the FCA imposes liability upon a person or entity that "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or conspires to do so. 31 U.S.C. § 3729(a)(1)(A)-(C). To state a claim under subsection (a)(1)(A), the relator must allege: "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false." *United States ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 740–41 (7th Cir. 2007) (internal quotation marks and citation omitted). To adequately plead a claim under subsection (a)(1)(B), the relator must allege that: "(1) the defendant made a statement in order to receive money from the government, (2) the statement was false, and (3) the defendant knew it was false." *United States ex rel. Gross v. AIDS Research Alliance–Chi.*, 415 F.3d 601, 604 (7th Cir. 2005). A claim that the defendants conspired to violate either of these provisions is subject to the normal pleading requirements for civil conspiracy claims. *See United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 n. 3 (7th Cir. 1999). The relator must allege that the defendant conspired with one or more persons to have a fraudulent claim paid by the United States, that one or more of the conspirators performed any act to have such a claim paid by the United States, that the United States suffered damages as a result of the claim.

Because the statute "condemns fraud but not negligent errors or omissions," claims under the FCA must be pleaded according to Federal Rule of Civil Procedure 9(b)'s heightened standard. *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir.

2003); *see Gross*, 415 F.3d at 603. To comply with Rule 9(b), a pleading need not "exclude all possibility of honesty in order to give the particulars of fraud." *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009). But the complaint must "show, *in detail*, the nature of the charge." *Id.* (emphasis added). This standard requires the pleading of facts that outline the "who, what, where, when, and how" of the alleged fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

Lisitza suggests that Rule 9(b) should be relaxed to accommodate the size and complexity of the alleged scheme and his lack of access to the details of the fraud without discovery. *See, e.g., Pirelli*, 631 F.3d at 446 ("information asymmetries" may warrant flexibility in Rule 9(b) standard). On this point, the Court finds that no such accommodation is needed, at least as to these defendants. This is not a case in which the defendants argue that the relator fails to "identify specific false claims for payment or specific false statements made in order to obtain payment," something generally required to survive a motion to dismiss an FCA claim. *See Garst*, 328 F.3d at 376. Against such an argument, the massive scope and duration of the alleged fraudulent scheme might weigh in favor of relaxing the requirement that the specific false claims be identified before discovery. But here, the defendants argue not that the relator fails to give enough details of the scheme, but that he fails to allege sufficient facts to plausibly suggest their participation in it. The relator fails to explain why the size and duration of the alleged scheme render it unworkable for him to make specific factual allegations about the manufacturers' role. Those facts are different from the particulars of the alleged false claims, which indeed could be difficult to set forth in comprehensive detail give the sheer volume and information imbalance between the parties.

Under the circumstances, whether fraud itself is pleaded with sufficient particularity is not the primary issue before the Court; the main question is whether these defendants participated in it. Alphapharm and Genpharm argue that, even if the relator sufficiently alleges the existence of fraudulent scheme to defraud the government by unlawfully swapping drug forms, there are insufficient factual allegations to support a claim that Alphapharm and Genpharm caused the false the claims to be submitted.[4] They further argue that they cannot be held liable for Par's misdeeds simply by virtue of their corporate affiliation or contractual relationship.

The relator retorts that the complaint sufficiently alleges that the two companies directly "caused" the submission of false claims or the use of materially false records or statements. *See* 31 U.S.C. § 3728(a)(1)(A) & (B).[5] According to the relator, the primary means by which Alphapharm and Genpharm "caused" the false claims is "through their control of Par." Resp. Dkt. # 133 at 12. Alphapharm and Genpharm "supervised Par's Sales & Marketing Division, knew the generic drug industry and the regulations governing pricing, and stood to benefit by the implementation of the fraudulent scheme." Resp., Dkt. # 133 at 13.

The problem is that the complaint does not allege specific facts that make the relator's theory of liability against these defendants plausible. The bulk of the allegations in the complaint

---

[4] Some of the companies' arguments are off the mark and are not further considered or discussed. In particular, the companies' argument that Lisitza must have "direct and independent" knowledge is misplaced; the statute imposes this requirement only when "an FCA relator's allegations are substantially similar to information about an alleged fraud that is already publicly disclosed," which is not the case here. See 31 U.S.C. § 3730(e)(4)(B); *Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907, 910 (7th Cir. 2009).

[5] In 2009, Congress amended Section 3729(a)(2) and re-designated it as Section 3729(a)(1)(B). Courts in this circuit have continued to apply the same pleading requirements to § 3729(a)(1)(B), and this Court will do the same without distinguishing cases that interpret the former § 3729(a)(2). *See United States ex rel. Dickson v. Bristol Myers Squibb Co.*, --- F.R.D. ----, 2013 WL 360299, at *1 n.3 (S.D. Ill. 2013); *United States ex rel. Walner v. Northshore Univ. Healthsystem*, 660 F. Supp. 2d 891, 896 n. 4 (N.D. Ill. 2009).

pertain to actions by Par and the pharmacies. According to the complaint, Par was the entity that executed the marketing of fluoxetine tablets, providing false information and financial incentives to the pharmacies along the way. So far as the complaint alleges, Alphapharm and Genpharm were several steps removed from the submission of false claims. They allegedly controlled Par, which did not itself submit false claims but is alleged to have caused the pharmacies to submit them. The relator's claims against Alphapharm and Genpharm therefore hinge on his ability to show that Alphapharm and Genpharm were orchestrating Par's allegedly unlawful marketing activities, but his efforts to do so fall short of plausibly suggesting that either company did so.

First, the relator contends that Genpharm and Alphapharm knew about the prescription switching scheme. Lisitza never says how that knowledge was acquired or by whom, but Rule 9(b), allows knowledge to be pleaded generally. Moreover, the relator stresses, "knowledge" under the FCA does not have to be actual knowledge; indeed, the statute makes clear that even reckless disregard for the truth can be "knowledge." *See* 31 U.S.C. § 3729(b). But neither of these points is enough to save the complaint from dismissal, because knowledge of a fraud is not a basis for FCA liability. *United States ex rel. Schmidt v. Zimmer, Inc*., 386 F.3d 235, 245 (3d Cir. 2004) ("[M]ere awareness that another may, or even has, chosen to make [a false] claim does not alone constitute 'causing a false claim to be presented'"); *United States ex rel. Tyson v. Amerigroup Ill., Inc*. 488 F. Supp. 2d 719, 736 (N.D. Ill. 2007) ("some affirmative action" beyond mere knowledge is required). The FCA's broad definition of knowledge "does not eliminate the need under subsection (a)(1) for some action by the defendant whereby the claim is presented or caused to be presented," nor does it "eliminate the need under subsection (a)(3) for proving that a person is a member of the alleged conspiracy." *United States v. Murphy*, 937 F.2d 1032, 1038-1039 (6th Cir. 1991). Knowledge is a necessary but insufficient basis for liability.

*See Tyson*, 488 F. Supp. 2d at 736 (explaining that knowledge is "required" although "mere knowledge of the submission of claims and knowledge of falsity" are insufficient for liability). Thus, the allegations in the complaint that Alphapharm and Genpharm knew of the prescription-switching—even though they pass muster under Rule 9(b)—are not enough to state a claim.

In addition to allegations of knowledge, the relator must supply facts to plausibly assert that Alphapharm and Genpharm *caused* other parties' false statements or the submission of false claims. This requires some affirmative participation or action by these defendants that furthers the unlawful objective. *See United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 714-15 (10th Cir. 2006). To be liable for "causing" false claims, a defendant must "knowingly *assist* in causing the government to pay claims which were grounded in fraud." *Schmidt*, 386 F.3d at 243. The relator directs the Court to paragraphs 202 through 214 of the complaint as describing "the means by which Defendants Alphapharm and Genpharm supervised and controlled the scheme." Resp., Dkt. # 133 at 7. This is a section of the complaint with the heading "Alphapharm and Genpharm Controlled Par." Although it generally describes the corporate affiliation between the companies and Par, and the companies' ability to hire or fire Par to market their products, it says nothing about the fraudulent scheme or the companies' participation in it. Essentially, the facts that Lisitza argues sufficiently link the non-Par defendants to the scheme are that: (1) Genpharm and Alphapharm controlled Par; (2) Genpharm and Alphapharm designed and supervised the marketing of fluoxetine tablets; and (3) Genpharm contracted for a portion of the fluoxetine revenue.

The allegations pertaining to the common parentage of Genpharm, Alphapharm, and Par, and the corporate overlap between Genpharm and Par are too general to provide factual support for the conclusory statement that Genpharm and Alphapharm controlled or directed Par with

9

respect to the fraudulent scheme. Parent firms are not generally liable for the misdeeds of their subsidiaries, *e.g., United States v. Bestfoods*, 524 U.S. 51, 61 (1998), and the FCA does not alter that general rule. "It has been established that merely being a parent corporation of a subsidiary that commits a FCA violation, without some degree of participation by the parent in the claims process, is not enough to support a claim against the parent for the subsidiary's FCA violation." *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 60 (D.D.C. 2007) (quotation marks and citations omitted). Here, facts suggesting direct participation by Alphapharm and Genpharm are wanting.

The relator emphasizes its allegations that Alphapharm and Genpharm specifically "controlled" or "directed" Par's marketing of the tablets. This conclusion requires some factual support. To the extent any is provided—for example, the fact that Alphapharm and Genpharm were at liberty to use any company of their choosing to market their tablets—it does not support their participation in the fraud. Nowhere in the 600-plus paragraph complaint is there a single allegation that any individual employed by Genpharm did anything to encourage or bring about the sale or marketing of fluoxetine tables *through fraud*. The relator essentially contends that control over marketing and participation in the fraud are one in the same, but that inference is not reasonable without other facts to connect the dots. The relator has not alleged that anyone at Genpharm actually "directed" Par to make false statements about the fluoxetine tablets, or to pay pharmacies to swap drug forms. The relator does not point to any individual who encouraged Par to market the tablets based on improper prescription-switching rather than aggressive salesmanship. Indeed, the means through which Genpharm exercised its alleged "control" and "direction" are not explained at all; the control and direction are for the most part inferred from the corporate structure. It is no wonder that Genpharm and Alphapharm spend part of their

10

motion arguing that the relator fails to allege appropriate circumstances for piercing the corporate veil;[6] reading the complaint gives one the impression that Genpharm and Alphapharm's liability is derivative of Par's. Although the relator explicitly disclaims such a theory—insisting that the defendants are directly, not vicariously, liable—the fact remains that the complaint does not allege facts that *the scheme itself* was controlled or directed by Genpharm and Alphapharm—just that they had control over Par in a general sense. For example, the relator alleges that Ian Jacobson of Genpharm was the supervisor of the Par employees who were the "architects" of the prescription-switching scheme. From that we are to infer that Jacobson, and therefore Genpharm (and Alphapharm) also supervised—"controlled" and "directed"—the scheme itself. This inference is not reasonable without some details suggesting any actual involvement by Jacobson, and the complaint provides none. Jacobson's involvement is pure speculation.

Genpharm's contracts with Par do not suffice as a basis for the relator's claims either. Under the contracts, Par had the exclusive right to market the fluoxetine tablets and would share 42.5% of the profits with Genpharm. This run-of-the mill distribution agreement does not make a fraud by Genpharm (let alone Alphapharm, which was not a party to the contracts) more plausible. All that can be inferred is that Genpharm stood to profit from sales of its product—a fairly mundane point. It is reasonable to infer that Genpharm had strong incentives to encourage the aggressive marketing of the product. But Genpharm would profit from legitimate sales, not just fraudulent ones. Its profit potential says nothing about whether it directed unlawful

---

[6] In FCA cases, the relator must show that the parent company "is liable under a veil piercing or alter ego theory, *or* that it is directly liable for its own role in the submission of false claims." *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 60 (D.D.C. 2007).

marketing tactics or even knew that the pharmacies were illegally switching drug forms. The relator fails to distinguish between Genpharm and Alphapharm's participation in selling and marketing their product and participation in the fraud allegedly perpetrated by Par and the pharmacies. But the two are not the same—or at least, the complaint does not provide a factual predicate for that inference. *Cf. Pirelle Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 445 (7th Cir. 2011) ("Absent a reason to think otherwise, the most plausible explanation for dispensing a well known, popular drug in any form is that it was prescribed.").

The last card in the relator's deck is his allegation that in an email Genpharm executive Ian Hilley referred to Par's "capsule tablet dodge." Compl., Dkt. # 35 ¶121. The relator treats this as his ace-in-the-hole, proving involvement by Alphapharm and Genpharm in the prescription-switching scheme. Resp., Dkt. #133 at 4, 13, 15, 17-18. Neither the complaint nor plaintiff's brief cites to an exhibit containing this phrase, however, and the Court did not find the reference among the many emails attached as exhibits to the complaint (not that it was the Court's job to hunt through hundreds of pages of exhibits). But even taking as true the assertion that a Genpharm executive did "extoll" Par's "capsule tablet dodge," Compl., Dkt. # 35 ¶ 121, this is still not enough to plausibly allege that Genpharm—let alone Alphapharm—knew controlled or participated in a scheme in which Par and the pharmacies were *unlawfully* switching medications. Genpharm and Alphapharm, who produced fluoxetine tablets and not capsules, obviously would want doctors and pharmacies to prescribe and fill prescriptions with tablets instead of capsules. Even if the tablets were subject to Medicaid reimbursement caps, the companies would *still* want tablets used instead of capsules, because they didn't make capsules. The relator interprets the term "dodge" to necessarily imply an "unlawful prescription-switching

12

scheme" but there is nothing inherently unlawful about a "dodge"—the term connotes eluding or evading, which would describe their objective in promoting sales of their tablets rather than Lilly's capsules whether they pursued that goal lawfully or unlawfully. Use of the phrase "capsule-tablet dodge" does not carry the talismanic weight that the relator attributes to it, and he supplies no other allegation to support an inference that the two companies sought to "dodge" the reimbursement caps on 20 mg. capsules by means of fraud rather than by lawfully convincing physicians to increase their prescriptions for fluoxetine tablets. Unless the FCA precludes the exploitation of price differentials by profit-seeking enterprises—which no one has asserted—the one-time use of the cryptic phrase "capsule tablet dodge" is not sufficient to plausibly suggest participation in a fraud.

The relator's claim of conspiracy against Alphapharm and Genpharm fails for the same reasons. To state a claim under what is now § 3729(a)(1)(C), the relator must allege that the defendants had an agreement, combination, or conspiracy to defraud the government by getting a false or fraudulent claim allowed or paid and that they did so for the purpose of obtaining or aiding to obtain payment from the government or approval of a claim against the government. *United States ex rel. Walner v. NorthShore Univ. Healthsystem*, 660 F. Supp. 2d 891, 895-96 (N.D. Ill. 2009). Even before *Twombly*, a bare allegation of conspiracy could not survive a motion to dismiss. *See Cooney v. Rossiter*, 583 F.3d 967, 970-71 (7th Cir. 2009); *Estate of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 517 (2007) ("Even under notice pleading, a complaint must indicate the parties, the general purpose, and approximate date of the agreement to form a conspiracy."). Facts must be alleged to suggest the existence of an agreement to violate the law. *See Twombly,* 550 U.S. at 557; *Ryan v. Mary Immaculate Queen Center*, 188 F.3d 857, 860 (7th Cir. 1999). There is nothing in the complaint that describes any agreement, explicit or

13

tacit, between Par and the manufacturers to cause pharmacies to submit false claims to the government, let alone any particulars of the agreement, including who participated (as corporations can act only through their agents). *See Walner*, 660 F. Supp. 2d at 898 ("Walner alleges that the Defendants participated in a conspiracy to present false statements and claims to Medicare in order to receive payment. But again, Walner fails to plead who agreed with whom, how they agreed, how they decided to file a false claim, who made the alleged misrepresentation, who filed the allegedly false claim, the method by which it was filed, and how much the payment was for"). The frequent references to the "defendants" as a collective does not suffice to allege a conspiracy. *See, e.g., Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 733 (7th Cir. 1998).

Alphapharm and Genpharm had obvious incentives to market fluoxetine tablets aggressively—including by persuading physicians and pharmacies to switch from capsules to tablets—but identifying and exploiting a gap in the coverage of Medicaid regulations is not unlawful, much less a violation of the FCA. The relator has failed to identify any affirmative actions by Alphapharm or Genpharm agents that plausibly suggest that they "caused" false claims to be submitted. At most, the relator alleges that the companies knew of Par's fraud and failed to stop it; this not enough to plausibly allege that these companies "caused" the false claims within the meaning of the FCA. *See Sikkenga*, 472 F.3d at 714-15.

* * *

Because the Complaint does not set forth allegations sufficient to plausibly suggest that Genpharm and Alphapharm "caused" the submission of false claims or the making of false statements, or that there was any agreement between them and Par or the pharmacies with respect to unlawfully substituting forms of prescribed drugs, the Court grants Alphapharm and Genpharm's motion to dismiss. This is the third version of the relator's expansive complaint,

which has also been reviewed and considered by the United States (which declined after its own investigation to intervene in the claims asserted against these defendants). There is, therefore, little reason to believe that further amendment is likely to cure the complaint's failure to allege the participation of these defendants in the allegedly unlawful scheme. Accordingly, the dismissal is with prejudice.

Entered: March 7, 2013

John J. Tharp, Jr.
United States District Judge