# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES ex rel. BERNARD LISITZA, et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 06 C 06131 |
| v. | ) ) | Judge John J. Tharp, Jr. |
| PAR PHARMACEUTICAL COMPANIES, INC., | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This case involves an alleged prescription-switching scheme in which defendant Par Pharmaceutical Companies allegedly caused pharmacies to submit false claims to avoid Medicaid reimbursement caps, resulting in overpayment by the federal and various state governments.[1] The claims are brought as a *qui tam* action under the federal False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA"), and parallel state statutes, by the relator Bernard Lisitza, various states,[2] and the federal government, which has intervened with respect to Par. The alleged false claims consist of the pharmacies' certifications, as a condition of Medicaid reimbursement, that they complied with all applicable federal and state laws when in fact they had illegally substituted the form (*e.g.* capsule or tablet) or dosage of certain drugs, not for a medically necessary reason but in order to avoid the reimbursement caps and in violation of regulations requiring cost efficiency and prohibiting drug substitutions.

---

[1] "[C]laims submitted to state Medicaid agencies are considered claims presented to the federal government and may serve as the basis for FCA liability." *United States ex rel. Watson v. King-Vassel*, 728 F.3d 707 (7th Cir. 2013).

[2] Two states, Indiana and Michigan, have intervened against Par and are directly participating as plaintiffs; the rest of the plaintiff-states' claims are brought via the relator.

According to Par, the parties have gone down—or should have gone down—this same road in a prior *qui tam* action that covered Par's marketing of the same drugs during the same time period, sought the same damages, and pertained to the very same claims for Medicaid reimbursement. Par therefore pleaded the affirmative defense of res judicata. The plaintiffs now move for judgment on the pleadings as to that defense; Par cross-moves for summary judgment. The issues have been fully briefed, and for the reasons set forth below, the plaintiffs' motion is granted and Par's motion is denied.

## BACKGROUND

The prior case (against Par[3]) began in 2005, when a Florida-based pharmacy, in its capacity as relator, sued Par and several other generic drug manufacturers under the FCA in the District Court for the District of Massachusetts. *See United States ex rel. Ven-A-Care of the Fla. Keys v. Actavis Mid Atlantic, LLC et al.*, No. 08 CV 10852. The complaint was further amended and unsealed on May 21, 2008. The *Ven-A-Care* plaintiffs alleged that Par manipulated and falsely reported three pricing benchmarks—Average Wholesale Price, Wholesale Acquisition Cost, and Direct Price—in order to cause the Medicaid Program to set higher reimbursement amounts for its drugs than would have been assigned if Par had published accurate benchmarks. Because the affected Par drugs were reimbursed at an artificially inflated rate, Par was able to market its products to pharmacy customers based upon the increased profit potential compared to other manufacturers' drugs. Among the Par drugs implicated in the *Ven-A-Care* lawsuit were its 150 mg and 300 mg ranitidine (heartburn medication) capsules and its 10mg and 20mg

---

[3] The *Ven-A-Care* lawsuit originated before 2005. *See United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Dey et al.*, No. 00-CV-10698 (D. Mass, Apr. 10, 2000). Par was made a defendant for the first time in the sealed Third Amended Complaint, filed on February 13, 2005.

fluoxetine (an antidepressant) tablets. This case pertains to those same four products plus Par's 7.5 mg tablets of buspirone, an anti-anxiety drug.

The *Ven-A-Care* case against Par was a sliver of a much larger multidistrict litigation, MDL No. 1456, entitled *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, and consolidated under Case No. 01 C 12257 in the District of Massachusetts. Multiple actions by *Ven-A-Care* were further subcategorized as *In Re Ven-A-Care Cases*, No. 06 CV 11337. The Judicial Panel on Multidistrict Litigation created the AWP MDL after concluding that the cases involved "common questions of fact concerning whether (either singly or as part of a conspiracy) the pharmaceutical defendants engaged in fraudulent marketing, sales and/or billing schemes by unlawfully inflating the average wholesale price of their Medicare covered prescription drugs in order to increase the sales of these drugs to health care professionals and thereby boost the pharmaceutical companies' profits."

Ultimately, Par reached a settlement with the *Ven-A-Care* plaintiffs, which led to the dismissal of the claims against Par on August 26, 2011. The settlement covered everything except the State of Illinois' claims for overpayment of Medicaid program reimbursements; accordingly, the dismissal was without prejudice to those claims and with prejudice as to all the others. By its terms, the settlement agreement was between the relator, Ven-A-Care, four individual plaintiffs, the "Settling States" of Texas, Florida, Kentucky, Alaska, and South Carolina, and Par. According to the agreement's express terms, "The United States is not a party," although the agreement was conditioned upon the United States' consent to the dismissal of the claims against Par. *See* Settlement Agreement ("SA"), Dkt. # 205 Tab 3 at 1.

The settlement agreement defines as "the Federal *Qui Tam* Proceedings" the *Ven-A-Care* case initiated by the original complaint of April 10, 2000, and thereafter amended three times

and unsealed. SA ¶ B. The "Federal Covered Conduct" is defined as the allegations in the complaint that: "[B]etween January 1, 1991 and the Effective Date of this Agreement, Par knowingly set, reported and/or maintained, or caused to be set, reported and/or maintained, false, fraudulent and/or inflated prices for certain of the Covered Drugs, including prices reported to, or published by, price publishing services ("Reported Prices") used by State Medicaid Programs to establish reimbursement rates, and that Par submitted, or caused to be submitted, false claims to the State Medicaid Programs based on the Reported Prices." SA ¶ J. Par denied any wrongdoing in connection with the Federal Covered Conduct as well as the Covered Conduct alleged by each respective Settling State. SA ¶ P. As relevant here, the Settlement Agreement was "intended to fully and finally resolve any and all claims against, and the liability of Par, arising under the Federal Qui Tam Proceedings, for the Federal Covered Conduct, except for claims for the Illinois Federal Share and Illinois State Share with respect to the Covered Drugs." SA ¶ S. By the terms of the Settlement Agreement, Par would pay $154 million in exchange for dismissal of the federal and related state proceedings and a release. *See generally* SA ¶¶ 1-12.

The settlement agreement contained releases by each of the Settling States and, as relevant here, the relator and the individual plaintiffs. The terms of the release for the Federal Covered Conduct are as follows:

> [The Relator and Indivdual Plaintiff Releasors] fully and finally, irrevocably and unconditionally release, acquit and forever discharge Par as well as its predecessors, successors and assigns, and its and their current and former direct and indirect parents, affiliates, subsidiaries, divisions, and related business entities, and its and their current and former officers, directors, shareholders, agents, employees, managers, partners, servants, attorneys, advisors and other representatives (collectively, the "Par Releasees") from any and all civil, regulatory and/or administrative claims, complaints, actions, suits, demands, grievances, controversies, allegations, accusations, rights, causes of action, liabilities, judgments, damages or proceedings of any kind or

> nature, as well as all forms of relief (including all remedies, losses, debts, attorneys' fees, penalties, punitive damages, costs, and expenses of every kind and however denominated), whether sealed or unsealed, known or unknown, foreseen or unforeseen, which have been asserted, could have been asserted or could be asserted in the future under any source of law, contract, in equity or other right against any of the Par Releasees based upon or arising out of the Federal Covered Conduct (the "Federal Released Claims"), including but not limited to the Federal Share of any claim brought by or on behalf of the District of Columbia or any of the states, excluding Illinois, or any United States territory for, or arising out of, the Federal Covered Conduct. Without limiting the generality of the foregoing, and to the fullest extent that the Relator and the Individual Plaintiffs are capable under applicable law, this release fully discharges and releases Par from (i) any obligation to pay Medicaid-related damages, restitution, fines and/or penalties arising from the Federal Covered Conduct; and (ii) any civil obligation to the Relator or its attorneys, including any Relator's share, expenses, attorneys' fees, and costs associated with the Civil Actions to which Relator or its attorneys may be entitled.

SA ¶ 6. The relator's release extended to its own claims and "to the extent it is capable under the law all *qui tam* claims brought on behalf of the United States in the Federal *Qui Tam* Proceedings." *Id.*

The United States consented to the dismissal of the claims against Par and acknowledged that its share of the settlement, $90,950,000, was fair and adequate. Consent, Dkt. #205 Tab 4. Thereafter, the settlement agreement was incorporated into the district court's order dismissing all claims but those of Illinois against Par with prejudice. Order, Dkt. # 205 Tab 5. The dismissal was entered on August 26, 2011.

In the meantime, the *Lisitza* case, filed on November 9, 2006, was underway in this Court, although it would be unsealed only on August 30, 2011.[4] The claims in this case are brought on behalf of the relator Bernard Lisitza individually and on behalf of the United States

---

[4] The parties have given the Court no indication that the unsealing of this matter on the heels of the dismissal in *Ven-A-Care* is anything but a coincidence.

and the States of Illinois, California, Delaware, Florida, Hawaii, Indiana, Louisiana, Massachusetts, Michigan, Montana, Nevada, New Hampshire, New Mexico, Tennessee, Texas, Virginia, New York, Oklahoma, Wisconsin, New Jersey, Georgia, Rhode Island, and the District of Columbia,. The United States, Indiana, and Michigan have intervened against Par. The complaint of the United States alleges: "Starting in April 1999 through December 31, 2006, defendant Par, which markets and sells generic drugs, increased its sales through an illegal switching scheme to fill Medicaid and other government third party payor health insurance program prescriptions with Par's higher-priced products rather than the specific drug that the doctor had prescribed, a scheme specifically designed to evade price limits on generic drugs." Compl. Dkt # 77 ¶ 20. The complaint alleges that Par caused pharmacies to switch prescriptions for Zantac™ and generic ranitidine tablets with Par's 150 mg and 300 mg ranitidine capsules (¶ 20); to switch prescriptions for Prozac™ or generic 10 mg and 20 mg fluoxetine capsules to Par's tablets (¶ 51); and to substitute twice as many of Par's 7.5 mg buspirone tablets when 15 mg tablets were prescribed (¶ 94). The complaint does not contain any allegations relating to Par's manipulation of reimbursement amounts through the scheme alleged in *Ven-A-Care*; namely, the false reporting of pricing data used as benchmarks by the Medicaid Program. Rather, the *Lisitza* complaint alleges that Par's prescription-switching scheme was a ruse to avoid reimbursement caps (price ceilings) altogether. According to the complaint, the scheme caused the submission of false claims including false certifications of compliance with Medicaid rules that require providers to furnish services economically and only to the extent medically necessary and false certifications of compliance with state and federal laws and regulations, several of which prohibit prescription substitutions.

Months after the *Ven-A-Care* settlement was final and the claims against it dismissed, Par filed a motion in this Court to "transfer" the *Lisitza* case to the District of Massachusetts so that Judge Saris could determine the res judicata effect, if any, of the *Ven-A-Care* settlement on this case. See Dkt. #112. Finding no basis for such a "transfer," Judge Gottschall, the predecessor judge in this district, denied the motion. Order, Dkt. # 141 (May 16, 2012). Par never applied to the MDL panel for a transfer of this case to the AWP MDL in the District of Massachusetts (of which *Ven-A-Care* was part).

After its transfer motion was denied, Par answered the amended *Lisitza* complaint and asserted the affirmative defense of res judicata. Dkt. # 160. The plaintiffs moved to strike that affirmative defense (see Dkt. ## 168, 170); rather than "strike" the defense, however, the Court ordered briefing on the merits of the res judicata defense. Order, Dkt. # 188 (Mar. 8, 2013). Thereafter, the plaintiffs moved for judgment on the pleadings, and Par cross-moved for summary judgment, on the issue of whether the claims in this case are barred by the judgment in the *Ven-A-Care* case. Those motions have been fully briefed and are ripe for ruling.

## DISCUSSION

The sole task before the Court is to determine whether the FCA claim against Par can go forward in light of the settlement and judgment in the *Ven-A-Care* case. Par contends that the claim is barred by some blend of the contractual release and res judicata. The plaintiffs, on the other hand, argue that this claim was not released in the *Ven-A-Care* case and that res judicata does not apply to the different claim alleged in this case.

Perhaps as a result of how the affirmative defense was pleaded, the parties at times conflate the separate defenses of res judicata and release. *See* Fed. R. Civ. P. 8(c)(1). But in the Court's view, if the legal claim in this case was released by contract (the prior settlement

7

agreement), then it would be barred whether or not all elements of res judicata are satisfied. And unless the settlement agreement contained some explicit waiver of res judicata, for example, the application of that defense does not turn on the intent of the parties with respect to the release. The Court therefore approaches the two defenses separately.

### A. Res Judicata/ Claim Preclusion

Par's primary argument is that the *Ven-A-Care* judgment bars the plaintiffs' claim. The preclusive effect of a federal court judgment is determined by federal common law. *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008). In federal court, res judicata (claim preclusion) has three elements: "(1) an identity of the parties or their privies in the first and second lawsuits; (2) an identity of the cause of action; and (3) a final judgment on the merits in the first suit." *Adams v. City of Indianapolis*, 742 F.3d 720, 736 (7th Cir. 2014). The parties appear to agree that there was a final judgment on the merits in the *Ven-A-Care* litigation, so that element will not be addressed further.[5] Par contends that every requirement for res judicata is satisfied; the plaintiffs primarily dispute the identity of the causes of action and further contend that the plaintiffs here are not the same or in privity with the *Ven-A-Care* plaintiffs.[6] Because Par raised the affirmative defense, it bears the burden of proof. *Taylor*, 553 U.S. at 907.

---

[5] A settlement can have preclusive effect only when it is incorporated into the terms of a judgment or consent decree. *Carver v. Nall*, 172 F.3d 513, 515 (7th Cir. 1999). The dismissal order in *Ven-A-Care* incorporates the settlement agreement. Order, Dkt. # 205 Tab 5.

[6] The plaintiffs also argue that the *Lisitza* claims could not have been brought in *Ven-A-Care* because of the FCA's first-to-file bar, which provides: "When a person brings an action under this subsection [referring to subsection (b), "Action by private persons"], no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730 (b)(5). The government did not bring, or intervene in, the *Ven-A-Care* action. Thus the relator in *Ven-A-Care* could not have proceeded on a later-filed claim if it was "based on the facts underlying" the pending *Lisitza* case against Par: in the First Circuit, where *Ven-A-Care* was pending, the first-to-file bar is jurisdictional and "exception free." *United States ex rel. Wilson v. Bristol-Myers Squibb, Inc.*, 750 F.3d 111, 117 (1st Cir.

Whether there is an identity of the cause of action depends on "'whether the claims comprise the same core of operative facts that give rise to a remedy.'" *Adams*, 742 F.3d at 736 (citation omitted). This means that the current matter and the previously litigated matter are based on the same, or nearly the same, factual allegations arising from the same transaction or occurrence. *Bernstein v. Bankert*, 733 F.3d 190, 226 (7th Cir. 2013); *Matrix IV, Inc. v. American Nat. Bank and Trust Co. of Chi.*, 649 F.3d 539, 547 (7th Cir. 2011); *Johnson v. Cypress Hill*, 641 F.3d 867, 874 (7th Cir. 2011); *Andersen v. Chrysler Corp.*, 99 F.3d 846, 852 (7th Cir. 1996).[7] In order to provide meaningful notice to litigants and "to yield predictable results," the transactional test must be applied to the facts of a case "at a sufficient level of specificity." *Andersen*, 99 F.3d at 852-53. If the transactional test is met (along with the other elements of res judicata), then the bar applies not only to those issues decided in the prior suit but all other issues that *could have been* brought in the prior case. *Matrix IV, Inc.*, 649 F.3d at 547.

In this case, Par insists that the identity-of-claims element is met because both lawsuits accuse Par of "taking advantage of increased Medicaid reimbursements," and the two alleged fraud schemes had "common goals, common results, and common injuries." *See* Mem., Dkt. # 204 at 2. According to Par, the very same false claims for the very same prescriptions are at issue in both cases. And each case targets "the same price and reimbursement related marketing

---

2014). But Par points out that the plaintiffs are wrong about the timing: the *Lisitza* claims against Par were filed on November 9, 2006; in *Ven-A-Care*, however, Par was first made a defendant on February 15, 2005. The *Ven-A-Care* claims against Par therefore came first, and so the plaintiffs here are wrong to invoke the first-to-file provision. (In their reply, the plaintiffs do not respond to Par's argument to this effect.) Of course, the provision is wholly irrelevant if the cases are not based upon the same facts.

[7] To the extent that Par, citing *Okoro v. Bohman*, 164 F.3d 1059, 1062 (7th Cir. 1999) argues that the Seventh Circuit uses a "broader test" than that cited by the plaintiff (relying primarily on *Andersen*) and set forth by the Court in the text above, the case law, including *Okoro*, does not support the existence of any "broader" formulation of the transactional test than that outlined in *Andersen* and applied consistently thereafter, including in the recent cases cited *infra*.

practices." *Id*. at 18. In other words, the legal claims in the two cases are the same because the underlying false claims are the same, albeit for different reasons.

For their part, the plaintiffs argue that the two lawsuits target two distinct fraud schemes based on different facts: one involving the manipulation of reported average prices and one involving the unlawful substitution of drugs. Each type of conduct, plaintiffs say, is wholly distinct, and each constitutes an independent violation of the FCA that caused different damages.

Par succeeds in establishing that the *legal* allegations of the two complaints are the same: that Par caused the submission of false claims at the expense of the Medicaid program by, as it euphemistically states, "taking advantage" of certain increased Medicaid reimbursements. But the *factual* allegations—the focus of the res judicata inquiry—are identical only if one accepts the view that the transaction at issue is the submission of a false claim (irrespective of how or why it was false), rather than the conduct that caused the claim to be false. For when it comes to what Par allegedly did—*how* it defrauded the government—there are very few common facts between the two complaints. The *Lisitza* complaint says nothing about the falsification of the published prices for the drugs at issue. The *Ven-A-Care* complaint says nothing about Par's practice of encouraging pharmacies to automatically substitute dosage forms regardless of medical need and cost efficiency. The factual comparisons that Par attempts to draw—for example, as to Par's marketing based upon the profit potential its schemes created—are not persuasive; these are a but a fraction of the allegations in *Lisitza*, and clearly there were separate alleged schemes with different financial incentives. The material factual allegations in the two complaints are simply not the same except at an extreme level of generality.

But the fact remains that both lawsuits target the submission of false claims for some of the same drugs during the same time period. Should it matter for purposes of *res judicata* that

those claims were false for different reasons? Par says no, relying almost exclusively on *United States ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905 (9th Cir. 1998). In that case, the relator alleged that a defense contractor had submitted false test certifications for flight data transmitters and fraudulently provided fluid in the transmitters that would freeze at 50 degrees below zero rather than the contractually specified 65 degrees below zero. The government intervened and took over the case, but pursued only the false-certification portion in its amended complaint; the fluid claim was severed, and the relator pursued it separately from the government. The *qui tam* case "based on the fraudulent certifications of tests," *id*. at 907, was settled. The government released all of its FCA claims, but the relator preserved his right to pursue claims that the damping fluid did not meet cold temperature performance requirements. The relator indeed continued the lawsuit based on those allegations, but it ultimately was dismissed on res judicata grounds. The Ninth Circuit affirmed that result, holding that the settlement of the false-certification claim was res judicata as to the fluid claim. *Id*. at 910. The court reasoned: "While Barajas is plainly correct that it is one thing to have fluid that gums up in the cold, and another to lie about whether the fluid was tested for gumming up, both wrongful acts arise out of the same attempt to get paid for flight data transmitters not up to specifications." *Id*.

*Barajas* supports Par's argument that it is irrelevant that the certified claims were false for multiple reasons, but the Court finds that case so factually distinguishable from this one that its persuasive effect is minimal.[8] In *Barajas*, the court was addressing the res judicata effect of the judgment on one claim as to another claim that originated in the same cause of action. Unlike in this case, moreover, the relator was the same in both cases, so there was no question of

---

[8] Furthermore, it is far from clear that the Ninth Circuit's "same transactional nucleus" test is applied to the same level of factual specificity that the Seventh Circuit requires. *See Andersen*, 99 F.3d at 852-53

adequate notice to the parties of the potentially preclusive result. And unlike in this case, it could be said unequivocally that the same set of false claims—the very same invoices—was at issue in both cases, and the damages were clearly the same in both. Thus it made sense to view the common transaction as the submission of "false invoices for the flight data transmitters." *Id*. at 910.

By contrast, *Ven-A-Care* and *Lisitza* involve two relators who separately brought suit based on vastly different facts and, as far as can be determined, had knowledge only of the facts underlying the frauds alleged in their respective cases. These lawsuits originated separately, unlike in *Barajas*, where the claims were brought together only to be severed later. More importantly, this case is distinguishable from *Barajas* because, although it is likely that some portion of the false claims at issue in this case were the same false claims at issue in *Ven-A-Care*, it is far from clear that the overlap is as total as Par suggests. For example, although some of the same drugs were at issue in both cases, the two sets of drugs do not completely overlap; buspirone was not one of the drugs at issue in *Ven-A-Care*. And because the universe of plaintiffs, particularly the participating states, is not identical in both cases, there are many allegedly false claims submitted to state Medicaid programs for reimbursement that are not at issue in both cases. With so many more states participating in this case, it stands to reason that more claims are at issue.

Furthermore, to the extent that the two lawsuits do pertain to some of the same false claims, the plaintiffs have persuasively argued that the damages nevertheless differ. *See* Mem., Dkt. 212 at 9-12. The damages in *Ven-A-Care* were simply the amount by which Par caused the reimbursement amounts to be inflated, whereas in this case, the damages might be the entire amount of the reimbursement (less any portion already paid as damages), if the plaintiffs prove

that claims for the particular drug forms and dosages at issue should not have been submitted at all because they were not authorized by a physician or were not the most cost-efficient option. Par should not have to pay the same damages twice,[9] but if the plaintiffs prove liability in this case, they will be entitled to damages for false claims that are unique to this case as well as whatever additional damages they can prove are owing on the false claims that were also at issue in *Ven-A-Care*. Therefore, it cannot be said in this case, as it was *Barajas*, that proving the second claim would have been "a waste of time." *See* 147 F.3d at 910.

Given the material factual distinctions, *Barajas* is not the silver bullet Par imagines. The mere fact that Par's divergent fraud schemes intersected at the point where the claims were submitted for Medicaid reimbursement is insufficient to trigger res judicata. *See, e.g., Colonial Penn Life Ins. Co. v. Hallmark Ins. Adm'rs, Inc.*, 31 F.3d 445, 451 (7th Cit. 1994) (res judicata did not bar second suit arising from same loan); *In Re Stoecker*, 5 F.3d 1022, 1031 (7th Cir. 1993) (res judicata did not apply where both claims "arise ultimately out of" the same loan and bankruptcy, because "conduct giving rise to the two claims occurred at different times and involved different acts by different parties"). Also to the point are cases in which separate lawsuits arising from the same plaintiffs' purchase of the same securities were permitted because the alleged frauds involved different conduct. *E.g.*, *Lindelow v. Hill*, 2001 WL 830956, at *10 (N.D. Ill. 2001).

Finally, although claim-splitting is often inappropriate and barred by res judicata, it is not absolutely prohibited; under certain circumstances, "[l]itigants who want to split a claim among different suits can do so." *Arrow Gear Co. v. Downers Grove Sanitary District*, 629 F.3d 633, 638 (7th Cir. 2010). The very fact that the defense can be waived—for example in an agreement

---

[9] Whether this is accomplished by a set-off or some other means remains to be seen.

settling related litigation—illustrates this principle. *See id*. And although the institutional concerns behind res judicata, not just the private parties' interests, must be honored, at times it is simply not feasible resolve all claims arising from similar events at once. Thus, in *Arrow Gear Co.*, lawsuits arising from the contamination of groundwater by various polluters proceeded separately, and the settlement of the residents' class action did not bar the government's ongoing regulatory action concerning the same incident. Where the federal government's investigation of the contamination was ongoing at the time of the first settlement, it "made sense" to claim-split and allocate the initial liability among the polluters until additional liability was determined. *Id*. at 638-39. So too, here: if the government's investigation into Par's fraudulent practices was ongoing as of the time of the *Ven-A-Care* settlement, there seems little reason that it should have been required to reject the settlement just to preserve its right to continue the investigation and uncover further misconduct and damages brought to light by another relator with knowledge of a different scheme.

The legal claims raised in *Ven-A-Care*, for purposes of res judicata, did not arise from a common factual nucleus with those raised here, unless the facts are viewed at a level of generality that is inconsistent with Seventh Circuit precedent and principles of fair notice to potential litigants regarding the need to combine lawsuits. Therefore, res judicata does not bar this suit. The Court need not address the parties' arguments about whether the parties to the two suits are identical or in privity and whether the claim in this case could have brought in the *Ven-A-Care* suit.

B.  Waiver

As should be clear from its decision on the merits of the res judicata defense, the Court rejects the plaintiffs' argument that Par waived it, but a few points merit explanation.[10] The plaintiffs argued that Par's acquiescence to the separate litigation of these cases, and its failure to seek transfer of this case to the MDL comprising many lawsuits premised on Par's alleged fraudulent pricing schemes (including *Ven-A-Care*) estop it from raising a res judicata defense in this case. *See* Restatement (Second) of Judgments § 26(1)(a) & cmt. a. There is some support for the idea that when two cases based upon similar facts are proceeding simultaneously, the defendant should bear the burden of objecting to the claim-splitting or losing the benefit of the res judicata defense. *See, e.g.*, Charles Alan Wright, Arthur R. Miller, et al., 18 Fed. Prac. & Proc. § 4415 (2d ed.) ("Few defendants are apt to request that additional demands be made against them. A rule that failure to object waives claim preclusion benefits would go far toward general destruction of claim preclusion. On the other hand, a defendant who is defending two simultaneous actions has little to lose and much to gain by an objection to the splitting. Thus it makes sense to require objection only if two actions are pending simultaneously."). Nevertheless, the Court is reluctant to find a waiver here based upon the mere failure to object, because Par raised res judicata as a defense as soon as it became viable—once there was an enforceable judgment in the other case. The plaintiffs do not contend that the defense is untimely, and

---

[10] Par fails to meaningfully engage with the plaintiffs' argument that Par's course of conduct throughout this litigation demonstrates acquiescence to claim-splitting. And Par's further argument that this Court has already rejected the waiver argument is simply wrong. This Court's prior order denied the relator's motion to strike the res judicata defense without prejudice to raising *all* arguments against it in a motion for judgment on the pleadings or motion for summary judgment. That order did not substantively address any of the plaintiffs' arguments, including its waiver argument.

"acquiescence" is not an appropriate descriptor of how Par has proceeded, based on its quick assertion of the defense.

Although Par's conduct falls short of the acquiescence that could constitute a waiver, its course of conduct is still illuminating in that in underscores the dissimilarity of the facts underlying this case the *Ven-A-Care* case. Clearly, the res judicata defense could not have been raised here before a final judgment in *Ven-A-Care*, but the same interests could have been enforced through other means if the cases were truly parallel. Most notably, Par never applied to the MDL panel for transfer of this case to the MDL of which *Ven-A-Care* was part. Under 28 U.S.C. § 1407, actions involving "one of more common questions of fact" pending in different districts "may be transferred" to a single district, and such transfers "shall be" made by the MDL panel—not by the judge in one of the disparate lawsuits. Par's motion in *this* Court to transfer this case to the District of Massachusetts—*after* Par had already litigated to settlement in the *Ven-A-Care* case, and six years into the life of this case—was a feeble substitute for an earlier motion to transfer to the MDL, if in fact Par believed that the cases shared a common core of facts. In other words, by the time Par brought its motion to transfer, it was already too late to prevent the main harm *res judicata* is meant to guard against: the duplicate litigation of similar claims. *See, e.g., Allen v. McCurry*, 449 U.S. 90, 94 (1980) ("[R]es judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication."); *Bernstein*, 733 F.3d at 225 (Claim preclusion "operates to conserve judicial resources and promote finality"); *Palka v. City of Chicago*, 662 F.3d 428, 437 (7th Cir. 2011) ("Res judicata promotes predictability in the judicial process, preserves the limited resources of the judiciary, and protects litigants from the expense and disruption of being haled into court repeatedly.").

Under federal law, a general equitable exception to res judicata has been met with much skepticism. *See Federated Dept. Stores, Inc. v. Moitie,* 452 U.S. 394 (1981); *Horwitz v. Alloy Automotive Co.*, 992 F.2d 100, 105 (7th Cir. 1993). This Court is not applying such an exception here; the elements of res judicata simply are not met. But Par's course of conduct reinforces the Court's view that this matter and *Ven-A-Care* do not present identical claims for purposes of res judicata.

### C.     Release

The factual disparities between the two cases also compel the conclusion that the claim in this case cannot fairly be considered part of the *Ven-A-Care* "Federal Covered Conduct" for purposes of the release. Ordinary principles of contract law govern the interpretation of the release. *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co., Ltd.*, 707 F.3d 853, 863 (7th Cir. 2013). Here, the parties fail to identify the governing substantive law or cite any applicable authority, but the settlement agreement itself provides that the law of the State of New York controls. *See* SA ¶ 18(a). Under New York law, a contract must be construed in accordance with the parties' intent, which is generally discerned from the document itself. *IDT Corp. v. Tyco Group*, 918 N.E. 2d 913, 916 (N.Y. 2009) (internal quotation marks and citation omitted). An agreement that is clear and unambiguous must be enforced according to the plain meaning of its terms. *Id.*

Here, the plaintiffs argue that the "Federal Covered Conduct" to which the *Ven-A-Care* release applies refers solely to the false price reporting at issue in that litigation, and, moreover, the settlement agreement expressly excluded from the release any conduct other than the false price reporting. Par, on the other hand, argues the release is broad and applies to all false-claims claims within the applicable time period.

Based on the plain language of the release, recounted above, the plaintiffs' arguments must prevail; the claims at issue in this litigation were not released as part of the *Ven-A-Care* settlement. The "Federal Covered Conduct" pertained only to allegations set forth in, or arising from, the *Ven-A-Care* complaint, which related exclusively to Par's scheme to manipulate reimbursement amounts by falsely reporting pricing benchmarks. As explained with respect to the res judicata argument, that "conduct" is not implicated by the complaint in this case, which is based on a distinct drug-switching scheme. The plain language of the release does not indicate the parties' intent to release claims unrelated to the pricing scheme. That is not to say that the plaintiffs' entire argument holds water; in particular, its reliance on Paragraph 14, the express exemption, is the product of circular reasoning. Paragraph 14 provides: "Notwithstanding any other term of this agreement, including the release . . . , any and all of the following are specifically reserved and excluded from the scope and terms of this Agreement, and from the scope and terms of the releases, as to any entity or person: . . . (i) Liability to the United States for any conduct other than the Federal Covered Conduct, and liability any state for any conduct other than [the Covered Conduct of each Settling State]." This paragraph adds no additional force to the plaintiffs' arguments, because it turns entirely on how "Federal Covered Conduct" is defined. As the Court has concluded, the Federal Covered Conduct pertains solely to the price manipulation scheme as alleged in the *Ven-A-Care* complaint; it is for that reason that Paragraph 14's exemption is relevant here.

Par's interpretation of "Federal Covered Conduct" is unpersuasive and inconsistent with the plain language of the settlement agreement. The release does not, as Par contends, apply to all "claims that could have been brought for the allegedly false claims that Par submitted or caused to be submitted." Mem., Dkt. # 204 at 23. There is no way to read the definition of

"Federal Covered Conduct" so broadly. The claims "based upon or arising out of the Federal Covered Conduct" do not include claims predicated on the drug-switching scheme alleged in the Lisitza complaint. In an effort to blur the distinctions between the reported price scheme at issue in *Ven-A-Care* and the drug-switching scheme at issue in this case, Par describes the facts at a level of generality and abstraction that would apply to almost any fraudulent scheme. That both schemes "centered on increasing sales of Par's drugs and its own profits," Dkt. # 204 at 18, is not a similarity between the schemes but a truism applicable to virtually any scheme to defraud Medicaid and Medicare. The same could be said, for example, of a scheme to promote off-label uses of Par's drugs (*e.g.*, *United States ex rel. Nathan v. Takeda Pharmaceuticals N.A., Inc.*, 707 F.3d 451, 455, (4th Cir. 2013)), yet it would not be reasonable to construe the release to extend to that conduct.

Nor does the fact that many of the claims that were false by virtue of one scheme were also false by virtue of the other bring the drug-switching scheme within the scope of the V*en-A-Care* release, which is expressly limited to claims asserting that "Par knowingly set, reported and/or maintained . . . false, fraudulent, and/or inflated prices for certain of the Covered Drugs, including prices reported to, or published by, price publishing services ('Reported Prices')." As such, the release speaks to *the conduct underlying* the submission of false claims. And to the extent that the release refers to the submission of reimbursement claims, it makes plain that the claims included in the release are those "based on the Reported Prices," which were deemed to be inflated by virtue of the alleged price manipulation by Par and other manufacturers—conduct that had nothing to do with the drug substitution scheme alleged in this case.

Par's attempt to attribute the profits derived from the drug switching scheme to the allegations of price manipulation in *Ven-A-Care* also falls short. According to Par, the plaintiffs

allege that the drug-switching scheme is profitable because "the cause for [the] reimbursement disparity [between drugs subject to reimbursement caps and those that are not] is that 'infrequently-prescribed drugs tend to be reimbursed at a higher level according to a rate established by the manufacturer's pricing." True enough, but the complaint in this case contains no allegation whatsoever that Par or other manufacturers falsely reported their prices in order to create that disparity, so there is no link alleged between the reported price scheme and the drug switching scheme.

Because the release applies only to such claims "based upon or arising out of" conduct that is expressly defined to include only the facts alleged in the *Ven-A-Care* complaint pertaining to the scheme to inflate reimbursement amounts by falsely reporting pricing data, the release does not apply to the claim asserted in this case.

* * *

Because this case does not raise the same claim litigated to judgment in *Ven-A-Care*, the plaintiffs' motion for judgment on the pleadings as to the defense of res judicata is granted, and the defendant's cross-motion for summary judgment is denied. Par's affirmative defenses of res judicata and release have been adjudicated and are no longer at issue in this case.

Date: July 31, 2014

John J. Tharp, Jr.
United States District Judge