**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES ex rel. BERNARD LISITZA, et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 06 C 06131 |
| v. | ) ) | Judge John J. Tharp, Jr. |
| PAR PHARMACEUTICAL COMPANIES, INC., | ) ) ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this, the fourth *qui tam* action he has filed relating to the same alleged scheme to defraud Medicaid, relator Bernard Lisitza alleges that defendant Par Pharmaceutical Companies, Inc., caused national pharmacy chains to submit false claims for reimbursement from state and federal government agencies. Specifically, he charges that Par orchestrated an illegal prescription-switching scheme by producing generic drugs in forms and dosage strengths not covered by existing Medicaid reimbursement limits, and then marketing its drugs to pharmacies based on their ability to obtain higher reimbursements from Medicaid than these drugs would fetch under federal and state maximums in place for more common forms of the medications.[1] He further contends that the pharmacies did not request the required physician approval to substitute the form or strength of the prescribed drugs, and in some cases they altered their computer systems to automatically switch drugs. Asserting claims under the False Claims Act and parallel state statutes, Lisitza charges that the reimbursement claims the pharmacies submitted were fraudulent because they failed to disclose that the drugs dispensed had been

---

[1] The lawsuit pertains specifically to fluoxetine, ranitidine, and buspirone—generic formulations of popular antidepressant, antacid, and anti-anxiety medications, respectively.

substituted not based on medical necessity or cost effectiveness but because they were simply more profitable for the pharmacies because they were not subject to the reimbursement caps on the drugs that had originally been prescribed.

Beginning in September 2001, Lisitza filed four *qui tam* suits based upon the prescription-switching scheme—three against pharmacies Omnicare, Walgreens, and CVS, and now this suit against Par and other drug makers that have since been dismissed from the case.[2] Lisitza's *qui tam* action was filed on behalf of the United States and 21 states.[3] The United States and the States of Michigan and Indiana intervened, against Par alone, and filed their own complaints.

This opinion addresses Par's motion for summary judgment against Lisitza, based on the contention that Lisitza is barred from being the relator because his complaint is based upon publicly disclosed information and does not contain allegations as to which he is the original source.[4] *See* 31 U.S.C. § 3730(e)(4). As explained in this opinion, the basis for inferring Par's participation in the drug-switching scheme was publicly disclosed during the course of the earlier cases against the pharmacies, and new material information about Par did not originate from efforts by Lisitza. Therefore, he is not authorized to proceed as the relator in this fourth iteration of his claims premised on the very same alleged prescription-switching scheme.

_____

[2] Each of the three cases Lisitza filed against the pharmacies settled, with no admission of liability, before any challenge to Lisitza's role as relator. *See United States ex rel. Bernard Lisitza v. Omnicare*, No. 01 C 07433 (N.D. Ill. 2001) *United States ex rel. Bernard Lisitza v. CVS*, No. 03 C 00742 (N.D. Ill. 2003); *United States ex rel. Bernard Lisitza v. Walgreens*, No. 03 CV 00744 (N.D. Ill. 2003). Mr. Lisitza has also served as relator in several unrelated healthcare fraud cases, involving marketing of the antipsychotic drug Risperdal.

[3] More precisely, seventeen States, two Commonwealths (Massachusetts and Virginia), and the District of Columbia, collectively referred to as the "states."

[4] Par also has other summary judgment motions pending against the United States, Indiana, and Michigan. *See* CM/ECF Nos. 358, 360, and 362. Those motions are addressed in a separate opinion being issued contemporaneously with this one.

# BACKGROUND

## A.    The Complaint

Lisitza's original *qui tam* complaint against Par, which will be referred to as the "complaint" for purposes of this motion,[5] was filed under seal on November 9, 2006. Compl., ECF No. 1 (unsealed 8/30/2011). Par was one of four defendants, all drug manufacturers and distributors (the other three, Dr. Reddy's Laboratories, Alphapharm, and Genpharm, are no longer parties).[6] Lisitza's complaint alleged that "from at least May 2001," the four undifferentiated "defendants," conspired with numerous pharmacies to increase Medicaid reimbursements by switching generic prescription medications to different forms or dosage strengths without physician approval. Compl. ¶¶ 3-5. Lisitza alleged that "Par initiated this

---

[5] Lisitza's operative complaint, the Corrected Second Amended Complaint ("CSAC"), was filed (in reality, by the government) on July 16, 2013. CSAC, ECF No. 232. For purposes of this motion, however, it bears noting that the original complaint reflects the basis of Lisitza's allegations before the government intervened and supplied information it uncovered during its investigation of Par; the information from that investigation (which is "public" because it is in the possession of the relevant government authority) cannot be what Lisitza based his original complaint upon if he is to be the relator. Therefore, even though Par nominally moves for judgment on the CSAC, the currently operative complaint, the question of what Lisitza based his allegations upon can only be answered by reference to his own original complaint. If his first complaint was based upon public information of which he was not the original source, an amended complaint buttressed by information he learned from the government would not save him. The government's Statement of Interest ("SOI") makes this point. SOI 4-5, ECF No. 354. It is true that under certain circumstances, the most recent amended complaint should be the basis of the Court's analysis. *See Rockwell*, 549 U.S. 457,473 (2007) ([N]ew allegations regarding a fundamentally different fraudulent scheme require reevaluation of the court's jurisdiction."). Those circumstances are not present here, where the core allegations have remained consistent (the amended complaints have simply reduced the number of defendants and added many exhibits (something not required)). But even if it should be the CSAC that the court considers, the outcome would be no different, as the Court still would be required to discern whether the allegations of *that* complaint originated with Lisitza.

[6] *See* Mem Op., ECF No. 187 (dismissing Alphapharm and Genpharm); Sec. Am. Compl., ECF No. 35 (terminating Dr. Reddy's as defendant). The Court granted motions to dismiss by Alphapharm and Genpharm because the allegations of the complaint failed to plausibly allege that they caused the pharmacies' submission of false claims. Par did not move to dismiss.

scheme by obtaining the U.S. marketing rights from companies such as [then-] defendants Reddy and Alphapharm for foreign-made drugs that were in different dosage forms and strengths of frequently prescribed prescription drugs. Then, Par marketed and supplied the different dosage forms or strengths to effectuate illegal drug switching." *Id.* ¶¶ 6, 35. Indeed, Lisitza alleged, Par "made the drug in a different form or strength specifically for the purpose of marketing the higher reimbursement rates than could be achieved by illegal switching." *Id.* ¶ 50.

The complaint alleges, for example, that Par conspired with Walgreens and other pharmacies to fill prescriptions for generic Zantac™, *i.e.*, ranitidine, with capsules instead of tablets. Because physicians prescribed ranitidine in tablet form the vast majority of the time, Medicaid published reimbursement limits for tablets but not for the more rarely prescribed ranitidine capsules. In seeking to maximize reimbursements, Lisitza alleged, the pharmacies falsely equated the two drug forms, and dispensed the substituted drugs without physician approval and regardless of their cost or any medical need for the change, in violation of state and federal laws. *Id.* ¶ 12. Inflating the costs through these machinations, Listiza alleges, constitutes submitting fraudulent claims for reimbursement. According to Lisitza, Par's "marketing, supply, and other activities caused, made, and used these false and fraudulent claims and statements." *Id.*

In the section of the complaint labeled "Relator Lisitza's Discovery of the Fraud," Lisitza—a pharmacist formerly employed by Omnicare—explained that he had been working through a placement agency to substitute for other pharmacists throughout Illinois on a temporary basis. Compl. ¶ 25. He became an itinerant pharmacist after Omnicare fired him in May 2001 for, he says, internally reporting prescription switching. (There is no dispute that this internal report did not mention Par.) Through his temporary assignments, Lisitza learned that other nationwide chains, such as Walgreens, also engaged in prescription switching. *Id.* ¶ 26.

Lisitza "brought the switching scheme to the government's attention in 2001" and was "the first person" to do so. *Id.* ¶ 27. "At that time and subsequently he informed the government of his belief that the manufacturer of ranitidine capsules and similar products was actively involved and promoting the switching scheme." *Id.*

The Lisitza complaint alleges that Par "created a market for drugs in a dosage form or strength that's principal use was unlawful switching" because there was no need for the alternative form or dosage options. Compl. ¶ 50. Among Par's marketing tactics to obtain the pharmacies' support, it "made presentations, distributed flyers, and used other methods," and tried to persuade pharmacies that, alternately, either capsules or tablets were "easier to swallow," depending on which formulation Par distributed. *Id.* ¶¶ 53. Par also allegedly made drugs "in a different form or strength specifically for the purpose of marketing the higher reimbursements that could be achieved by illegal switching." *Id.* ¶ 50. As part of the scheme, Walgreens altered its electronic distribution system "so that it was virtually impossible" for a pharmacist to select the tablet form of ranitidine (which Par did not manufacture). Par marketed its formulations as equivalent to and interchangeable with other forms. Compl. ¶ 58.

A similar scheme evolved for fluoxetine (generic Prozac™), as to which Par had exclusive rights to distribute in tablet form, rather than the more common capsules. During its period of exclusivity, Par "convinced nationwide pharmacies to change the prescriptions without doctors' (or patients') consent." Compl. ¶ 69. Finally, Lisitza alleged the same scheme with respect to Par's marketing of 7.5 mg buspirone (generic Buspar™ tablets), which already came in 5-, 10-, and 15-mg strengths (15mg being the most commonly prescribed). Par drove the scheme by supplying "enormous quantities" of the 7.5 mg tablet, for which no reimbursement limits had been set, in contrast to the dosage strengths or forms already on the market.

The complaint does not say how Lisitza came to discover Par's involvement in the scheme or how he knew that Par distributed unnecessary alternative strengths and forms of existing medications, that it marketed the drugs to pharmacies specifically on the basis of evading reimbursement caps, or that its actions caused the submission of false claims by the pharmacies. But in a footnote, Lisitza asserted that he is "an original source" of his allegations against Par under the FCA and all relevant state statutes. Compl. ¶ 16 n. 2. He alleged his "direct and independent knowledge of the information" on which the fraud claims are based. *Id.* ¶16. Lisitza stated that he was "concurrently" providing the United States and State Attorneys General with a disclosure statement summarizing the known material evidence. *Id.* ¶ 17.

## B.     Par's Motion

Par's current motion for summary judgment presents only the question whether the 31 U.S.C. § 3730(e)(4) precludes Lisitza from proceeding as the relator in this case against Par.[7] Before its amendment, effective in 2010, the federal statute provided: "No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). An "original source" was defined as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before

_____

[7] The parties agree that the resolution of the public-disclosure issue under the federal FCA also resolves the same issue under the relevant state statutes as well. *See* Par. Mem. 27-29, ECF No. 337; Relator Mem. 30, ECF No. 350. The parties each say the states' public disclosure provisions are as applicable, or inapplicable, as the federal one. *Id.* This Court will follow their lead and not parse the state versus the federal statutes, absent any substantive argument that state law public disclosure bars are more favorable toward would-be relators.

filing an action under this section which is based on the information." *Id.* § 3730(e)(4)(B). The pre-2010 statute applies because Congress made the amendments "generally applicable only to conduct occurring on or after May 20, 2009," except for "the amendment to section 3729(a)(1)(B)," which contains the substantive prohibitions of the FCA. *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011); *see Cause of Action v. Chicago Transit Authority*, 815 F.3d 267, 271 n.5 (7th Cir. 2016) (applying pre-2010 provision); *United States ex rel. Absher v. Momence Meadows Nursing Center, Inc.*, 764 F3d 699, 706 (7th Cir. 2014) (2009 amendments not retroactive);. Therefore, the Court must look to the statute in effect at the time the underlying events took place. *Leveski v. ITT Education Servs., Inc.*, 719 F.3d 818, 828 (7th Cir. 2013); *United States ex rel. Baltazar v. Warden*, 635 F.3d 866, 867 (7th Cir. 2011) (same). As quoted above, the pre-2010 statute expressly made the public disclosure bar a matter of jurisdiction, *see Rockwell,* 549 U.S. 457 at 468, and so in this case, it remains a question that must be decided before the merits.[8] *Absher*, 764 F.3d at 706.

## FACTS

In reviewing the motion for summary judgment, the Court must view the facts and draw reasonable inferences in favor of the non-moving party, to the extent they are supported by the record. *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 823 (7th Cir. 2011). Under Local Rule 56.1(a)(3) & (b)(3), the parties must set forth, and respond to, proposed undisputed facts and provide support with admissible evidence. *See also* Fed. R. Civ. P. 56(c) &

---

[8] In this case even a a jurisdictional defect as to Lisitza's status as relator would not be fatal to the federal FCA claim or the state law claims of Indiana and Michigan, which can still be prosecuted by the intervenor governments. "[A]n action originally brought by a private person, which the Attorney General has joined, becomes an action brought by the Attorney General once the private person has been determined to lack the jurisdictional prerequisites for suit." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 478 (2007). The remainder of the states, however, did not intervene in the relator's suit, so dismissal of those claims based on the lack of jurisdiction to hear the relator's claims would effectively terminate the claims of the non-intervenor states.

(e). The parties have done so here, and the factual summary that follows is derived from their submissions, to the extent that facts are material, properly supported with evidence, and not competently disputed.

### A. The Relator's Experience and Knowledge

Lisitza worked as a pharmacist for Jacobs Healthcare, which Ominicare later bought, for nearly ten years. He was fired in 2001, officially for using inappropriate language with a nurse, but, according to Lisitza, as retaliation. Before he was terminated by Omnicare, Lisitza had witnessed and reported a prescription switching scheme involving ranitidine capsules manufactured by Geneva. It is undisputed that while working at Omnicare, Lisitza had no contact with any drugs manufactured by Par. Lisitza then began work at Cub Pharmacy until 2004 and later worked as an itinerant substitute pharmacist for RPH On The Go, until his full retirement in November 2006. His work took him to pharmacies all around Illinois such as Kmart, Walmart, and Sam's Club, but never Walgreens. Lisitza did, however, work at pharmacies that received transferred prescriptions from Walgreens, and Lisitza saw hundreds of pill bottles from Walgreens pharmacies that bore Par's name as the drug manufacturer.[9] He also remembers one instance of calling a Walgreens pharmacist to inquire about a prescription he was transferring in for "a farmer," and the pharmacist telling him that at Walgreens, fluoxetine tablets, not capsules, were automatically dispensed and the pharmacists could not control it. Lisitza Resp. SOF ¶¶ 13, 23, ECF No. 351. This occurred while Lisitza was working at a K-Mart pharmacy, at a location and time Lisitza could not remember (but which must have been between 2004 and 2006 when

---

[9] Par contends that this fact is not "supported by any details" and that Lisitza failed to produce a single pill bottle to the government. *See* Reply 1, ECF No. 355. But Lisitza attested to his exposure to the Par drugs sold by Walgreens when patients brought the bottles into other pharmacies to transfer their prescriptions. Par has no evidence to the contrary.

he worked for RPH). Lisitza observed the same phenomenon of unusual drugs sold by Par throughout "the whole system." Lisitza Dep. Vol II 261-263, ECF No. 352-1.

Lisitza never worked for or with Par, nor did he ever have contact with anyone from Par. He was not present for or privy to any communications or negotiations between Par and Walgreens. He neither attended any marketing presentations made by Par, nor viewed any marketing materials distributed by Par. While investigating the pharmacies and later Par, the state and federal governments obtained marketing information and presentations from Walgreens' and Par's executives and other personnel, and that information "got back" to Lisitza's attorneys and then to him. Lisitza also received from his attorneys a report of the government's questioning of Walgreens executives, from which Lisitza inferred that it was "obvious" that Par convinced Walgreens that Walgreens would profit from switching to Par's formulations. Lisitza then deduced through "common sense" that Par had developed and marketed the alternative dosage forms to convince its customer pharmacies to take advantage of the reimbursement differences.

From September 26, 2001 to April 15, 2004, Lisitza met three times with federal investigators. The meetings were about the pharmacies' switching of ranitidine, although Lisitza did suggest that other drugs should be investigated. Par was not discussed at any of these meetings. But Lisitza related in a January 31, 2003, disclosure statement (his third of four) his belief that drug manufacturers were aware of the switching and "may be worthy of investigation" for their role in the fraud scheme. He stated:

> Relator notes that Geneva Generic and **Par Pharmaceuticals** (pharmaceutical manufacturers) and McKesson and Cardinal (pharmaceutical distributors) are the principal sources of ranitidine capsules for many large chains. Their records should indicate if Walgreens is purchasing ranitidine capsules rather than tablets in bulk. Based on the pattern of several national [pharmacies] selling

capsules rather than tablets, we believe that the manufacturers are aware of this practice. **Their participation in this scheme may be worthy of investigation**.

Lisitza Resp. SOF ¶ 14, ECF No. 351, & Par Exh. 16. This passage is the only instance before August 2006 in which Lisitza specifically referred to Par in his dealings with the government. In three live interviews from 2001 to 2004, he did not. But at some later point, he says, "the cloud cleared," and he "finally concluded definitively" that Par "had an active role," at which time he "called [his] lawyers." Lisitza Resp. SOF ¶ 14, ECF No. 351. This occurred "no later than early August 2006."[10] *Id.* ¶ 22. This was long after he had filed three *qui tam suits* already (against Omnicare in 2001 and against CVS and Walgreens in early 2003). Lisitza did not testify that any particular event prompted this sudden belief that Par was the driver of the pharmacies' schemes to defraud the government through the submission of false claims.[11] Indeed, so far as the record reflects, the additional information Lisitza acquired by early August 2006, after his January 2003 suggestion that Par, along with other drug manufacturers, "may be worthy of investigation," appears limited to the observation of Par's name on pill bottles, as his single conversation with a Walgreens pharmacist about that chain's automatic substitution of tablets for capsules did not, so far as the record shows, reveal any information about Par's participation in particular.

**B.      Other Facts about Par and the Prescription-Switching Scheme**

Before the filing of this lawsuit, the pharmacies' prescription-switching of ranitidine, fluoxetine, and buspirone was already the subject of multiple lawsuits, and the fraud allegations against the pharmacies were well-known. As far back as July 2001, Walgreens had received a

---

[10] It is not insignificant the Lisitza admits he was "in a cloud" until sometime around August 2006; it suggests that he had no information to link Par (specifically) to fraud at any point before then, regardless of what independent investigation he purported to do before then.

[11] That was apparently not his whole belief at the time, because his original complaint, from November 2006, alleges in no uncertain terms that Alphapharm and Genpharm created and executed the fraud scheme, using Par as a tool.

warning letter from the Illinois Department of Public Health about its automatic switching of ranitidine tablets to capsules—specifically, ***Par's*** 150 and 300 mg capsules. Lisitza Resp. SOF ¶ 25, ECF No. 351. The letter stated that Walgreens' communication to its pharmacists that ranitidine capsules are medically identical ("AB rated") to ranitidine tablets was deceptive, and a retraction and corrective statement were required, as were instructions to all Walgreens pharmacists that the capsules were not to be substituted for tablets without physician approval.

On September 26, 2001, Lisitza filed the first of his *qui tam* FCA actions, against Omnicare. It is undisputed that Mr. Lisitza's initial disclosures leading to the *Omnicare* case were the first time that the United States Attorney's Office for the Northern District of Illinois was alerted that pharmacies were switching the dosage forms or strengths of commonly-prescribed drugs, presumably to profit from claims submitted to Medicaid. Affidavit of Linda Wawzenski ¶ 3, ECF No. 352-1.[12] The government opened an investigation into Omnicare in response to Lisitza's disclosure. A federal investigation into Walgreens was opened the following year, on July 15, 2002, after the Illinois Department of Public Aid advised the federal government that Walgreens showed the same pattern of switching as Omnicare. The government's case file indicates that its Walgreens investigation spun off from its Omnicare investigation and focused on whether it had dispensed ranitidine tablets in place of prescribed ranitidine capsules without physician approval. Thus, there is and can be no dispute that the pharmacies' scheme had been made public long before this case was filed in 2006.

Also publicly available before Lisitza filed this complaint were basic facts about Par's business and about Medicaid reimbursement caps on generic drugs. *The Pink Sheet*, a

---

[12] Assistant United States Attorney Linda Wawzenski, who represents the United States in this case, was responsible for the investigation of the pharmacies, and later, the drug manufacturers including Par.

pharmaceutical industry publication, reported in April through October 2001 that Par intended to market 7.5 mg (not 15mg) buspirone tablets and fluoxetine tablets (rather than capsules). *The Pink Sheet* articles stated that "most states," or "just over 30 states," do not allow the substitution of one form of a drug for another without physician authorization. Par SOF ¶ 7, ECF No. 338. The Pink Sheet also described Par's marketing strategy to "to reach physicians and pharmacists through a direct mail and telemarketing campaign, and through promotions by wholesalers. Par has also developed promotional materials aimed at consumers, which can be distributed through chain and independent pharmacies." Par SOF ¶ 8, ECF No. 338. On April 30, 2001, *The Pink Sheet* reported: "Par is planning a marketing campaign highlighting that the [fluoxetine] tablets are bioequivalent to the capsules." Par SOF ¶ 7, ECF No. 338. In October 2001, the publication reported that Par was "working with chains such as Walgreens, which exclusively stocks [Par's] 20 mg tablets [of fluoxetine]." Par SOF ¶ 9, ECF No. 338.

The federal and state governments make public, on an ongoing basis, their reimbursement limits for all covered prescription drugs. Medicaid reimbursement caps, or Federal Upper Limits (FULs), are published on the Centers for Medicare and Medicaid Services (CMS) website and distributed to regional offices and "people in the industry." Par SOF ¶ 10, ECF No. 338 (citing Gail Sexton, who was in 2001 the Health Insurance Specialist and Acting Technical Director of the Division of Pharmacy of CMS). Similarly, state Medicaid agencies publish the Maximum Allowable Costs (MACs) for prescription drugs. Lisitza does not dispute that "Medicaid reimbursement ceilings are published and disseminated by the federal and state governments." Lisitza Resp. SOF ¶ 10, ECF No. 351.

The U.S. Attorney in this District opened a separate investigative file for Walgreens on August 12, 2002. It is undisputed that, during the Walgreens investigation, the government

sought, and Walgreens produced "transactional information, internal e-mails regarding Walgreens' interchange program with respect to ranitidine and fluoxetine, and certain marketing materials that *Par* provided to Walgreens." Rel. Resp. SOF ¶ 28, ECF No. 351 (emphasis added). The investigative file shows that federal investigators were actively seeking documents from Walgreens and interviewing its personnel about the alternative dosage and drug forms it dispensed from the beginning of the investigation. *See* Par Ex. 27, ECF No. 338-27. Moreover, a letter of August 8, 2003, from Walgreens' counsel to the Attorney General of Massachusetts in response to a document subpoena, makes clear the state was seeking documents related to Walgreens' payments to the drug distributors and manufacturers and documents from pharmaceutical sales representatives; the state also asked Walgreens to identify any employee who had "substantial or regular contact" with the manufacturer of the subject drugs, *i.e.*, Par. See Par. Ex. 31, ECF No. 338-31.

From August 2006, when federal investigators opened an independent investigative file for Par, through 2008, the United States Attorney's Office and state Medicaid Fraud Control Units (MFCUs) subpoenaed documents and interviewed Walgreens and Par personnel. The first document subpoena issued directly to Par relating to the allegations in the FCA cases was served on Par by the Florida MFCU on July 25, 2006. *See* Par Exs. 27, 28; ECF Nos. 338-27 and 338-28. The issuance of that subpoena to Par was logged in the U.S. Attorney's file with the note, "Walgreens case." The National Association of Medicaid Fraud Control Units—a conglomerate of the state MFCUs—also began investigating Par beginning no later than August 2006. Par produced documents in that investigation, including those pertaining to its dealings with Omnicare and Walgreens about ranitidine, fluoxetine, and buspirone. Par and Walgreens employees also testified on the subject.

## C.    This Lawsuit

As noted above, Lisitza says that he (via his attorney) told the government no later than early August of 2006 that he had concluded that Par was involved in the pharmacies' drug-swapping fraud; further, his attorney submitted a draft complaint to the United States Attorney involved in the pharmacy investigation on September 14, 2006. Lisitza's attorney attests to his belief that he began to draft the complaint sometime in August 2006. He further says that he orally communicated to the United States Attorney that Par was part of the fraud scheme at about the same time. Lisitza maintains that the Florida MFCU subpoena "was developed after Mr. Behn's [Lisitza's attorney] report to the government investigators of Mr. Lisitza's conclusions about Par." Rel. Mem. 22, ECF No. 351. This "report" was made during one of several oral exchanges with the government (as to which Behn could not recall the dates and has no records),[13] but which he is certain occurred no later than "early August" of 2006.  *See* Relator SOF ¶¶ 23-25, ECF No. 552. On November 10, 2006, Lisitza's attorney sent another disclosure letter to the United States, along with a copy of the sealed complaint, notifying the government of the filing of this new *qui tam* action.

According to the United States, which filed a "Statement of Interest" ("SOI") regarding Par's motion to exclude Lisitza, *see* SOI, ECF No. 354, "while the pharmacies' involvement was obvious in that the pharmacists had to execute the switches in order to obtain the additional reimbursement, the potential role of drug manufacturers was not so clear." SOI 2, ECF No. 354. The government confirms that during the prosecution of Lisitza's *qui tam* suits against the pharmacies, he provided disclosure statements that "articulated his suspicions that Par played a

---

[13] It is unclear whether the federal government has in its Walgreens or Par case files and record or notes of these conversations; it has produced none. The affidavit of the Assistant United States Attorney, despite describing the timeline of the government's knowledge and investigations, is also silent about any oral disclosures by Lisitza's attorney.

role in the scheme."[14] Further, on July 25, 2006, the Florida Medicaid Fraud Control Unit subpoenaed Par, and before Par responded, Lisitza's attorney provided the United States Attorney with the draft *qui tam* complaint against Par. The federal government received Par's responses to the Florida subpoena on October 26, 2006, two weeks before Lisitza filed his lawsuit. "The United States did not formally open an investigation into Par until after Lisitza filed the qui tam action." Statement SOI 2, ECF No. 354.

The state and federal governments continued to investigate Par through 2008. The large majority of the interviews and depositions took place after this lawsuit against Par and the other manufacturers was filed. Neither Lisitza nor his counsel attended the interviews, during which Walgreens and Par personnel discussed Par's marketing and sales of ranitidine, fluoxetine, and buspirone. At least 25 of the 55 exhibits supporting Lisitza's current complaint (the CSAC) were produced to the government by Walgreens or Par.[15] There were none attached to his original and first amended complaints, both of which were filed before the United States intervened in the case. Mr. Lisitza had not seen these documentary exhibits before he was deposed by Par on February 18, 2014 (the CSAC was filed July 16, 2013). When questioned about how he was able to "research" that Par had orchestrated the fraud, Lisitza testified that he "just" used "public information" because that was all that was "available" to him at that time. Lisitza Resp. SOF ¶ 32, ECF No. 351. But Lisitza also attested that the government knew about Par only because of

---

[14] This is an overstatement. To the Court's knowledge, the record contains evidence of a single instance in which Par was mentioned in any disclosure statement, and that statement expressed no suspicion about Par in particular—just "the manufacturers," all of which Lisitza said "may be" worthy of investigating.

[15] The parties do not make clear when the documents included with the CSAC, but not the original complaint, were obtained; presumably, however, the documents from Walgreens, bearing Walgreens' bates numbers, were obtained as a result of one or more grand jury subpoenas issued to Walgreens in 2003. *See, e.g.*, ECF 338-31 (Walgreens' response to Massachusetts grand jury subpoena dated July 10, 2003).

Lisitza's "own first-hand observations [of pill bottles], research, and logic," and, further, that he was the only one who "named Par." *Id.*

## DISCUSSION

Summary judgment "shall" be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Yahnke v. Kane Cty., Illinois*, 823 F.3d 1066, 1070 (7th Cir. 2016). The underlying substantive law governs whether a factual dispute is material; irrelevant factual disputes do not preclude summary judgment. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Seventh Circuit prescribes a three-part inquiry to evaluate whether the FCA's public disclosure bar applies. *Cause of Action*, 815 F.3d at 274; *Baltazar*, 635 F.3d 867; *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009). First, the fraud or its critical elements must be "publicly disclosed" before the relator files his complaint. *Cause of Action*, 815 F.3d at 274. Second, the complaint must be "based upon" the publicly disclosed allegations. *Id.* If the first two parts are satisfied, then the bar applies *unless* the relator is an "original source" of the information upon which the fraud claim is based. *Id.* The relator has the burden of proof at each step of the inquiry. *Id.*; *Glaser*, 570 F.3d at 913.

The Seventh Circuit has observed that application of the bar is "straightforward" in a case where an allegation of fraud has already been made public. *Absher*, 764 F.3d at 708. The bar also applies in the less clear-cut circumstance where "facts disclosing the fraud itself are in the government's possession or in the public domain," in which case the courts must "determine whether facts establishing the essential elements of fraud—and consequently, providing a basis

for the inference that 'fraud has been committed'—are in the government's possession or the public domain." *Id.* (citation omitted). In this case, an allegation of fraud had already been made—the prescription switching scheme was discovered and made public by various means, including *qui tam* law suits filed against the pharmacies by Lisitza, years before Lisitza filed this complaint, which concerns the same claims that were at issue in the lawsuits against the pharmacies. The only questions, therefore, are whether Lisitza based his fraud allegations against Par on new information outside the public domain or the government's possession and, if not, whether he is nevertheless the original source of the information on which the allegations in his complaint against Par are based.

A. **The Critical Elements of Par's Alleged Fraud Were Publicly Disclosed.**

The Seventh Circuit holds that a "public disclosure" occurs when the "critical elements exposing a transaction as fraudulent are placed in the public domain." *United States ex rel. Feingold v. AdminaStar Federal, Inc.*, 324 F.3d 492, 495 (2003); *Glaser*, 570 F.3d at 913. The question is not whether the fraud itself is public, but whether the "basis for the inference" of the fraud is in the public domain. *Absher*, 764 F.3d at 708. Of course, events covered by the news media or otherwise "open or manifest to the public at large" are in the public domain. *Cause of Action*, 815 F.3d at 274. So too are facts that are already the subject of some public proceeding. *See Absher*, 764 F.3d at 708.

Further, the Seventh Circuit has repeatedly held that facts are in the public domain if they are in the possession of the government. *United States ex rel. Mathews v. Bank of Farmington*, 166 F.3d 853, 861 (7th Cir. 1999) *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907 (7th Cir. 2009); *see also Cause of Action*, 815 F.3d at 267; *Feingold*, 324 F.3d at 496. Although it has acknowledged that the majority view is that

disclosure to the government alone does not constitute "public" disclosure and that the view has "significant force," *Cause of Action*, 815 F.3d at 277, the Seventh Circuit has maintained its position that "the Government's possession of the information exposing a fraud is alone sufficient to trigger the public disclosure bar." *Id.* at 275. This Court, of course, is obligated to apply existing circuit precedent.[16]

This Circuit's rule that disclosure to the government is "public" disclosure within the meaning of the FCA is not without limits, however. The disclosure must be made to an official or body with "direct responsibility" for the claim in question. *Bank of Farmington*, 166 F.3d at 861. In other words: "Assuming no other public promulgation of the information, the public official to whom the information is disclosed must be one whose duties extend to the claim in question in some significant way." *Id.* ("It would not have been public disclosure here had the Bank divulged the information in this case to a postal carrier or to the Governor of Guam and to no one else."). Once information is in the hands of someone "authorized to act for or to represent the community," it is disclosed to the public. *Id.* Allegations are considered to be in the possession of the government, for example, when they appear in a warning letter from an agency, when they are the subject of an audit, when they are included in an agency's reports, or when they are provided to a public official with managerial authority for the claims being made. *Glaser*, 570 F.3d at 913.

---

[16] Lisitza and the government contend—contrary to Seventh Circuit precedent—that information obtained by the government, like discovery materials, cannot be considered "public" until filed in a case. Lisitza Mem. 12-14, ECF No. 355; SOI 5-6. The Court does not agree that the materials produced and information developed in an ongoing investigation, not litigation, are best categorized as "discovery," but in any event the Seventh Circuit has rejected the argument that "unless the allegations of wrongdoing have been widely disseminated, the government must take some affirmative step to publicize its investigation." *Glaser*, 570 F.3d at 913.

Here, there is no question that all the allegations relating to *the existence* of the prescription-switching scheme were publicly disclosed before the filing of the complaint in this action. There were three prior lawsuits, and the government of course had extensive knowledge of the scheme by the time this case was filed. The only question is whether a factual basis for inferring *Par*'s alleged role in the scheme was in the public domain. It was.

Describing Par as "the missing link underlying the fraud," Lisitza Mem. 2, ECF No. 350, Lisitza contends that it was he "who discovered the drug-switching fraud, and it was [he] who identified Par's role in it, just as he had done with respect to Omnicare, Walgreens and CVS."[17] *Id.* at 10-11. That's a bit of an overstatement. Putting aside the fact that Par was not a missing link needed to establish the pharmacies' scheme (the pharmacies could have carried out the alleged scheme entirely independently from the manufacturers),[18] the only information that Lisitza provided to the government about Par was that Par was the manufacturer of all the drugs that he saw being switched by the pharmacies. But that information was already in the public domain. First, industry publication *The Pink Sheet* reported Par's development and marketing of the different dosages strengths and formats of popular generic drugs. There was no mystery, therefore, about what firm brought to market the new dosage strengths and formulations of the three drugs at issue in this case. Nor was Par's strategy of marketing its drugs as functional equivalents of drugs already in the marketplace any secret; again, the *Pink Sheet* published this

---

[17] There is no question here of whether Lisitza discovered the pharmacies' drug switching fraud. That fact has little to do with whether Lisitza is a proper relator as to Par.

[18] Lisitza maintains that his genius was to discover the "common denominator—a manufacturer or wholesaler—[that was] providing these independent pharmacies with the knowledge, opportunity, and incentive to make the switch." Lisitza Mem. 5, ECF 350. But he fails to explain why pharmacies could not have figured out on their own that switching to drugs not subject to reimbursement caps would be more profitable. Merely revealing that Par was the manufacturer of drugs that some pharmacies were switching to does not suffice to reveal or confirm Par's role in a scheme to defraud.

plan, including Par's successful bid for Walgreens to exclusively use Par's fluoxetine tablets in place of capsules. Second, it was public knowledge that Par's new drugs were not subject to FULs or MACs, because the reimbursement caps for every drug are published and posted on government websites.

In any event, none of this information "confirmed" Par's role in the alleged fraud, as Lisitza maintains. Lisitza Mem. 2, ECF 350. The information for which Lisitza takes credit falls far short of revealing Par's participation in a scheme to defraud the government, as Lisitza ironically admits in arguing that the publicly available information, such as industry publications and published reimbursement caps, "did not . . . come close to revealing Par's fraud." *Id.* at 11. But arguing that identifying the drug manufacturer "does not come close" to revealing that Par was also a fraudster undermines his own contention he revealed the alleged fraud. This may explain why Lisitza was more modest in his 2003 pre-complaint disclosure, where he advised the government not that Par was a participant in the alleged drug-switching fraud but only that drug manufacturers (but not Par specifically) "may be worthy of investigation."

Beyond this public information, Lisitza provided no information about Par's involvement in the alleged drug-switching scheme. Rather, as Par notes, all factual information about Par's marketing practices came from documents and testimony obtained during state and federal investigations into the pharmacies, and ultimately, Par. This evidence, not disclosures by Mr. Lisitza, provided the basis for all the factual allegations embodied in Mr. Lisitza's draft and final complaints. Reply 1, ECF No. 355. The government's SOI does not refute this and in its opposition to Par's motion for summary judgment on the merits (as opposed to the instant jurisdictional motion), the United States expressly agrees: "Plaintiffs' case is based principally on a host of 'smoking gun' contemporaneous documents and testimony from Par, Walgreens,

and Omnicare witnesses." Pl. Mem. 2-3, ECF No. 369. None of these documents or witnesses were identified by Lisitza; to the contrary, he acknowledges that he learned of these materials from the government. *See* Lisitza Dep. Tr. 238:16–242:2; 258:5–259:18, ECF No. 11. ("A. Here again, this was—this information was obtained from Par executives and marketing people when they were questioned by the federal government, and it got back to my attorneys, and they got back to me that they thought they had to convince nationwide pharmacies that it was okay to switch."). And indeed, Lisitza acknowledged in his deposition that he used only public information in his investigations. *Id*. at 69:11–16 ("Q. So in your research, what nonpublic information did you rely on? A. I just … I just used the public information. That's all I had available.").

Further, based on the government's longstanding investigation into the prescription-switching scheme, this Court agrees with Par's argument that the key elements of the alleged fraud were known to responsible government agencies or officials, which means that the information had been publicly disclosed. State and federal agencies responsible for investigating Medicaid fraud and prosecuting FCA claims possessed information about the existence of the prescription-switching scheme based on their previous and ongoing investigations into the pharmacies. *See Bank of Farmington,* 166 F.3d at 862. And of course the contours of the alleged scheme were known to the United States Attorney, and to the public as well, as a result of Lisitza's three prior *qui tam* actions; "Walgreens' and Par's pre-*qui tam* complaint disclosures to the government," Par says, provided the "necessary facts" on which to predicate an investigation of Par in addition to the pharmacies. Reply 8, ECF No. 355, Par SOF ¶ 28, ECF No. 338. Moreover, the federal government received a tip in July 2002 about Walgreens from the Illinois Department of Public Health; four years passed before Lisitza "discovered" Par, the only drug

manufacturer implicated in the Walgreens scheme for the subject drugs. The earlier warning letter from the Public Health Department to Walgreens cautioned it about only one product: *Par* ranitidine capsules. A warning letter is considered within the public domain. After that warning, an email from Thomas Lawlor (Walgreens' director of pharmacy marketing) to all the pharmacies discusses the program of switching to *Par's* ranitidine capsules in particular on June 1, 2001. ("Walgreens will begin transitioning all prescriptions for Ranitidine 150mg and 300mg tablets (Mylan) to Ranitidine 150mg and 300mg capsules **by Par Labs**."). And Par itself was responding to investigative requests as far back as 2003, as evidenced by the letter from its attorney to the Massachusetts Attorney General's Office. Once investigators received "marketing materials and communications between Walgreens and Par employees concerning proposed dosage-form substitutions and the potential for increasing profits and maximizing Medicaid reimbursements," Lisitza was not needed to fill in any gaps. His allegations, therefore, are deemed to have been publicly disclosed. *See Bellevue v. Universal Health Services of Hartgrove, Inc.*, — F.3d —, 2017 WL 3392384, *5 (7th Cir. Aug. 8, 2017) (public disclosure bar applied where information available to government put it in position to draw same inferences that relator relied on).

The government, supporting Lisitza, appears to place great weight upon the fact that a separate case file for Par was not opened until after the original complaint in this case was filed in 2006. But this is mere formalism; the Affidavit does not say that the responsible federal government actors *lacked information* about Par's role before this suit was filed. Par's activity was already part of the investigation of Walgreens because Walgreens had been producing information that identified Par as the manufacturer of drugs that the pharmacies were switching to (which is all that Lisitza claims he did). In any event, the Seventh Circuit has made clear that

"whether one lawyer knew of" the information supporting a claim "is of no moment." *Feingold,* 324 F.3d at 496; *see Graham Cty.*, 559 U.S. at 300 (proper question is not whether fraud allegations "have landed on the desk of a DOJ lawyer"). Therefore, the affidavit of the particular Assistant United States Attorney prosecuting this particular case cannot vitiate what "the government" knew (especially state governments), and in any event, the Affidavit says only that a Par file had not been opened, not whether Par had yet been implicated in the scheme. What matters is whether any responsible government authorities had the information, not what file contained it.

This Court's decision in *United States ex rel. Nehls v. Omnicare, Inc.*, No. 07 C 5777, 2013 W.L. 3819671 (N.D. Ill. 2013), is not to the contrary. The government's knowledge here far surpasses the single FBI interview that was at issue in *Nehls*. *See id* at *7. Here we have an extensive, years-long investigation conducted by myriad state and federal agencies into the very scheme at issue. The same investigators and attorneys representing the United States in this action were involved in the pharmacy cases, too. Particularly after the Seventh Circuit reaffirmed in *Cause of Action* that knowledge of responsible government agencies is attributed to the public at large, the information known to the government about the alleged scheme must be considered to have been publicly disclosed and within the public domain.

Based on, at a minimum, these four facets of the record—the trade publication, the public posting of reimbursement caps, the three prior lawsuits, and the knowledge of the federal government and certain states about Par's role in the prescription-switching practices at Walgreens before August 2006, the Court concludes that the critical elements supporting allegations of fraud against Par were in the public domain before Lisitza filed his lawsuit

alleging that Par and three other drug manufacturers (as to whom Lisitza had even less information) were responsible for the fraudulent scheme.

### B.  Lisitza's Claim Is "Based Upon" Publicly Disclosed Information.

Still, Lisitza might avoid the public disclosure bar if his claim is not "based upon" the information that is already within the public domain. The Seventh Circuit first held in *Glaser* (overruling its prior precedent) that a claim is "based upon" publicly disclosed allegations if it rests on allegations that are "substantially similar" to the publicly disclosed information. *Glaser*, 570 F.3d at 915.[19] If the lawsuit is even partially based on the public information, the bar applies. *Id.* at 920-921. And here, where there had already been three lawsuits concerning the same drug-switching scheme, and the very same set of allegedly false claims, it cannot seriously be argued that Lisitza's complaint is not based on public information, at least in part. *See, e.g., City of Chicago ex rel. Rosenberg v. Redflex Traffic Systems, Inc.*, No. 15 C 08271, 2016 WL 4203835, at * (N.D. Ill. 2016) (complaint describing the "same scheme" actively under investigation by federal and local officials was in more obvious jeopardy of being "substantially similar" to allegations in public domain).

But a relator can still proceed if he brought to bear some "genuinely new" and "material" information beyond what was public. *Cause of Action*, 815 F.3d at 281; *United States ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 936 (7th Cir. 2012). The relator cannot merely "parrot" information that was in the public domain. *Id.* 680 Nor can he just add details. *See United States ex rel. Heath v. Wisconsin Bell Inc.*, 760 F.3d 688, 691 (7th Cir. 2014); *Glaser*,

---

[19] Prior to *Glaser*, the Circuit's interpretation was that "a claim which both depends essentially upon publicly disclosed information and is actually derived from such information is 'based upon' a public disclosure." *United States ex rel. Mathews v. Bank of Farmington*, 166 F.3d 853, 864 (7th Cir. 1999), <u>overruled by</u> *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009).

570 F.3d at 921. But if the relator undertakes private investigation or performs independent analysis that is necessary to reveal the fraud, then the claim is not deemed to be substantially similar to the public information. *See Heath*, 760 F.3d at 691; *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1017 (7th Cir. 1999).

So, to avoid the bar, Lisitza again emphasizes his discovery that Par was the manufacturer of the subject drugs that Omnicare and Walgreens[20] were switching and argues that this was a result of his own investigation and analysis. Par's involvement in the scheme, he maintains, is new material information that takes his complaint outside the public disclosure bar. And indeed, the record permits the conclusion that, by virtue of his experience handling pill bottles from many different pharmacies—*i.e.*, independent investigation—Lisitza identified Par as the manufacturer of various generic drugs in atypical dosage strengths and forms.

But the record does not allow the reasonable inference that Lisitza brought to bear any "genuinely new" and "material" information that revealed Par as a *participant in the fraud scheme*. Instead, Lisitza simply speculated that Par was involved in the scheme because its drugs were a common denominator. He had suspected "manufacturers" in general long before filing this lawsuit, but he developed no new information over the intervening years to bolster that suspicion, beyond learning the name of the ranitidine supplier for Walgreens. "[I]ndependent investigation and analysis," *Heath*, 760 F.3d at 691, were required to bear out Lisitiza's suspicion, but Lisitza was not the one who did it, nor was he in any position to do it. Unlike the relator in *Heath*, Lisitza did not possessive "extensive knowledge" of Walgreens' and Omnicare's billing practices and use it to supplement existing knowledge. *Id*. at 691-92. He

---

[20] Omnicare has hardly figured in the discussion thus far, and for good reason. Lisitza purports to have uncovered Par's role in the fraud while working as a retail pharmacist, long after he left Omnicare, which services nursing homes directly.

made a guess and did nothing, personally, to confirm it. Moreover, Par's identity as the common manufacturer (a public fact) is equally consistent with a theory that the pharmacies sought out Par's unique products in order to evade reimbursement caps; it says nothing of whether Par *induced* the pharmacies through strategic marketing and *caused* them to submit false claims. On this point Lisitza used only his "common sense" to infer Par's participation; that is not "evidence upon which this suit depends," which—again, as to Par—came from elsewhere.

The government, in support of Lisitza, argues the manufacturers' role was "not so clear" compared to the pharmacies,' SOI 1-2, ECF No. 354, alluding to the language of Seventh Circuit cases suggesting that a scheme "harder to detect" than one previously known is more likely to escape the "substantially similar" bar, *see, e.g. Leveski*, 719 F.3d 818; *Goldberg*, 680 F.3d at 934. This might well be true but it does not establish that Lisitza detected the scheme as it pertains to Par. To the contrary, the Wawzenski affidavit says nothing at all about any contribution that Lisitza made to demonstrating that Par was instigating the drug-switching practices of the pharmacies. Rather, it confirms that Lisitza stated in a single disclosure that he *suspected* it of all the manufacturers; that is different. The FCA does not reward suspectors; it rewards relators—that is, whistleblowers or others who provide non-public information sufficient to give rise to an inference that the government is being defrauded. Tellingly, Lisitza is unable to cite a single case in which a relator survived the public disclosure bar where his sole contribution was to identify (or to suspect) another participant in an already well-known fraud subject to an ongoing investigation.

The Seventh Circuit has, however, held that merely identifying another participant in the same publicly disclosed fraud scheme does ***not*** suffice to clear the public disclosure bar. In *United States ex rel. Bogina v. Medline Industries, Inc.*, 809 F.3d 365, 370 (7th Cir. 2016), the

Seventh Circuit concluded that identifying an additional class of fraudsters (other recipients of kickbacks as a part of a known scheme) did not mean the relator's allegations weren't "substantially similar" to ones already disclosed. In that case, the relator claimed to have discovered through a business associate that Medline, a supplier of medical equipment, gave bribes and kickbacks to the Tutera Group, a chain of nursing homes, to induce it to purchase from Medline. "Medline [had] been sued before for engaging in such conduct, though until the present suit the Tutera Group had not been specifically accused of being one of Medline's partners in fraud." *Id*. at 367. Medline had settled with the government in an earlier *qui tam* suit brought by another relator. *Id*. at 369.

The Seventh Circuit rejected Bogina's arguments that he had brought something new to the table because the earlier lawsuit focused on hospitals, not nursing homes; that his lawsuit pertained to different government programs that were defrauded; and that his lawsuit contained more recent allegations of fraud that occurred after the settlement. The differences, according to the Court, were "unimpressive" where, among other things, it was commonly known that Medline sold to nursing homes, and it was common sense that bribes or kickbacks would be offered for products covered by other federal programs, not just the ones implicated in the first lawsuit. *Id*. at 370. Because "the only significant information that appears in Bogina's complaint but not in [the earlier one] is the name 'Tutera Group' and references to government health care programs besides Medicare Part A and Medicaid," and "[n]either body of information" *materially* added to publicly disclosed allegations against Medline, *id*., the *Bogina* suit was held to be "based upon" publicly disclosed allegations. *See also United States v. Emergency Med. Assocs. of Illinois, Inc.*, 436 F.3d 726, 729 (7th Cir. 2006) (public disclosure bar applied where there were published reports of similar schemes in other hospitals; relator's information held

inadequate because it only identified another potential defendant). *Cf. Bellevue,* 2017 WL 3392384, *6 (expansion of time period over which fraud scheme operated insufficient to clear substantial similarity hurdle).

Contrast with *Bogina* the case of *United States ex rel. Baltazar v. Warden*, in which the Seventh Circuit held that the relator did not base his suit upon public information when his information "plac[ed] the defendants among the perpetrators of fraud." 635 F.3d at 868. In that case, the relator, a chiropractor, told the government that her former employer routinely added to her billing slips services that had not been rendered or had changed the codes for services she did perform. *Id.* at 866. Therefore, although there were widely published reports about such practices among chiropractors generally, this relator possessed provider-specific, not industry-wide, information, and as the Court remarked, in this type of FCA case, "[i]t takes a provider-by-provider investigation to locate the wrongdoers." *Id.* at 866-88.

The same principles carry through here. When Lisitza identified Par as a common factor, he did so in the context of an already well-known scheme, and with respect to the *same set of false claims* at issue in the cases against the pharmacies. Therefore, *Bogina* all but forecloses Lisitza's argument that he can still be said to have brought something new, and material, to the table if he identified another fraudster in the same scheme. *See Leveski*, 719 F.3d at 833 (making converse point that a second FCA *qui tam* suit was **not** "based upon" a prior one because the relator did more than add a few allegations and used "inside information that she obtained during her decade-long employment to make allegations that are noticeably different from any prior allegations against [the defendant for-profit college].") Here, since the same false claims are at issue, it is even more apparent than it was in *Bogina* that this lawsuit is "based upon" public

allegations. Lisitza cannot cite even the kind of distinguishing circumstances that were not enough to nudge Bogina over the line.

This also is not a case like *Baltazar*, where the allegations against the defendant were "based on [relator's] knowledge about defendant's practices." 635 F.3d at 868; *see Leveski*, 719 F.3d at 719. Lisitza had *no* knowledge of *Par's* marketing practices, the only basis upon which Par could be found to have "caused" the submission of the pharmacies'' false claims (just manufacturing or distributing the pills would not plausibly suggest participation in fraud). Another case that Lisitza believes is decisive, *Absher*, is inapposite. Although in that case, earlier government surveys had revealed that the defendant nursing home had given non-compliant care, the relators offered evidence about kinds of violations not disclosed in the surveys, which also had not disclosed facts establishing that the defendant had misrepresented its standard of care. 764 F.3d at 708-709. Therefore the Seventh Circuit concluded that the bar did not apply to the relators.  Here, though, Lisitza did not provide any information or observations about Par's practices, actions, or conduct. He was in no position to obtain any such new evidence independently. Rather, his complaint was "based upon" his suspicions, "common sense," and the "public sources" that Lisitza said in his deposition were the "only" information he could use for research;  later, he and his lawyer acquired information from the government.[21] As in *Bogina*, Lisitza simply repackaged the pharmacy cases, involving a well-known scheme, into allegations against a new defendant—without adding new information to support, specifically, the new defendant's knowing participation in the scheme. *See Glaser*, 570 F.3d at 833. This conclusion is

---

[21] Lisitza's featured evidence (credited for purposes of this motion) that on at least one occasion (of unknown date) he telephoned a transferring pharmacy and conversed with a pharmacist about the original prescription, the substitution, and whether the physician had approved, is unenlightening. Nothing about this interaction implicates Par as a participant; if anything, it was evidence of Walgreens' evasion of reimbursement caps.

underscored by Lisitza's pivoting, after the government intervened, to identifying Par as the originator of the scheme, whereas his earlier complaints alleged that Alphapharm and Genpharm were the masterminds who simply used Par to accomplish their fraudulent scheme.

### C. Lisitza Is Not the Original Source of the Allegations in His Complaint.

If, as the Court has concluded, Lisitiza's *qui tam* suit is based upon publicly disclosed allegations as those terms are defined in the FCA and the parallel state statutes, the jurisdictional bar applies unless Lisitza qualifies as an original source of the information on which the fraud claim is based. To be clear, he need not be the source of the information that entered the public domain—that can come from anywhere—but of the facts supporting the allegations in his complaint. *Baltazar*, 635 F.3d at 869. To be an original source, the relator must have "direct" and "independent" knowledge of those facts. *Leveski*, 719 F.3d at 836; *Glaser*, 570 F.3d at 921. An "original source" need not have independent access to any of the filed false claims or other paperwork, but must have information that is personal and specific to him, based on his own observation or investigation, rather than information obtained, for example, from a co-worker, or —critical here—a lawyer or a prior lawsuit. *Leveski*, 719 F.3d at 836-37; *Glaser*, 70 F.3d at 922; *Lamers*, 168 F.3d at 1017. Whether a relator is an "original source" overlaps somewhat with the issue of whether his lawsuit is "based upon" or "substantially similar" to publicly disclosed information. *See, e.g., Leveski*, 719 F.3d 836 (relator was original source "for the same reasons" that court found her allegations were not "based upon" prior public disclosures.)

Par argues that Lisitza is not the original source of the allegations in his lawsuit for several reasons. First, it says he lacks "direct knowledge" of the information on which his claim is based because he never witnessed any of Par's marketing to any pharmacy, never worked at Walgreens, never worked at Par, and "was not privy to any communications between and among

these entities." Mem. 24-25, ECF No. 337. Second, Par contends that Lisitza's knowledge is not "independent," because, it says, Lisitza saw nothing with his own eyes except what it characterizes (wrongly, *see* n.9, *supra*) as a single pill bottle at some unknown location and unknown time, and he learned about what Par allegedly did (apart from sell the subject drugs) only from the government's investigation into Walgreens, as relayed to him by his lawyer. Par also argues that simply "connecting the dots" of public facts, even if he used his professional experience to do so, does not make him an original source. *Id*. at 26.

Lisitza, of course, argues that he "easily satisfies the criteria" to be the original source. Mem. 21, ECF No. 350. He argues that although he is not an insider-whistleblower, he conducted an "independent investigation" that qualifies him as the original source. *See id*. at 21. Specifically, he "witnessed, first-hand, hundreds of prescriptions, involving multiple pharmacies, switched from fluoxetine capsules to fluoxetine tablets, from ranitidine tablets to ranitidine capsules, and from buspirone 15 mg tablets to buspirone 7.5 mg tablets" and then "identified Par as the common link in the switching scheme, as Par's name appeared on those hundreds of bottles of the 'switched-to' drugs." *Id.* at 23. Moreover, Lisitza contends that he need only have independent awareness of *some* essential information, not all the allegations in his complaint.

To be clear at the outset: whether Lisitza was the original source of the allegations of the pharmacies' allegedly fraudulent prescription-switching schemes—and there is no reason to believe he was not—is irrelevant to the question at hand. Any research, investigation, or connecting-of-dots that led him to credibly accuse Omnicare, Walgreens, and CVS of violating the FCA goes to his status as relator in those cases, not this one. Certain allegations might pertain to all four cases, but the primary issue on the merits here is whether Par orchestrated the scheme and caused the pharmacies to submit false claims. Therefore, Lisitza has the burden here of

showing that he had direct and independent knowledge of fraudulent conduct *by Par*. Otherwise, he is engaged in what the Supreme Court calls "claim smuggling." *Rockwell Int'l Corp*., 549 U.S. at 476. The FCA "does not permit jurisdiction in gross just because a relator is an original source with respect to some claim." *Id*. The plaintiffs will need to prove, ultimately, Par's deliberate intent to exploit reimbursement loopholes for the purpose of causing the pharmacies to submit false claims for reimbursement (by way of inflating the cost to Medicaid through the violation of regulations requiring them to dispense cheaper, medically necessary treatments approved by a physician). Lisitza needs to be the original source of *these* allegations against Par, not of the pharmacies' switching scheme generally.

To support his theory that his allegations against Par derive from his own independent investigation, Lisitza relies primarily on *Lamers*, another case in which the relator was not an insider whistleblower but an outside, yet well-informed, observer. The FCA complaint in *Lamers* alleged that the City of Green Bay was violating a provision of the Federal Transit Act barring public transit systems receiving federal funds from providing public bus service "that exclusively transport[ed] students and school personnel in competition with a private schoolbus operator." *See* 168 F.3d at 1014, 1015. The relator, a private bus company owner, alleged that although the City had an FTA-compliant policy, in reality it disguised what were functionally school-bus routes because the general public could not easily learn about or access those nominally public bus routes, which stopped at the area schools. *See id*. at 1017-18. Lamers, the relator, uncovered this by literally walking the streets and "keeping an eye on how the City's practices matched up to its statements." *Id*. at 1018. In a "close call" decision, the Seventh Circuit concluded that, although anyone else could have done the same thing, Lamers ("a bit of a busybody with his own

agenda") could be said to have conducted the independent investigation that filled a gap in the government's knowledge. *Id*. at 1018.

Lisitza's analogy to *Lamers* is inapt because, to the extent his observation of pill bottles somehow can be characterized an independent investigation, it did not supply any essential information *about fraud* by Par. In *Lamers*, by acting as a "private investigator" who walked the streets, the relator discovered facts that directly revealed fraud—namely, that the City was in fact running its bus lines in a way that conflicted with its statements and certifications to regulators. The government might have been able to glean that information had it performed the same investigation, but without Lamers' tip, it would not have had reason to. The same was true in the *Leveski* case, in which an employee-relator detected a discrepancy between "how [her employer] claimed to compensate her and how [her employer] actually compensated her" based on her own investigation and observation. 719 F.3d at 831.

By contrast, Lisitza's pill-bottle epiphany did not reveal or establish that Par caused the pharmacies' false claims for reimbursement. Taking the facts in the light most favorable to Lisitza, his observations revealed simply that the fraudster pharmacies sought out Par's drugs to sell, maybe without physician approval for substitute dosage strengths and formulations, and maybe without attention to medical necessity and cost. That Lisitza was attuned to potential fraud because of his earlier cases and that, by dint of his occupation, he was in an ideal position to identify the manufacturer, is granted. But that doesn't mean he learned facts that would allow him to bring a lawsuit plausibly alleging a fraud by Par. Indeed, despite claiming to have viewed "hundreds" of pill bottles with "switched" drugs, other than the one bottle received from "a farmer," which he discussed with a Walgreens pharmacist, Lisitza presents zero evidence to support the claim that the other "hundreds" of bottles contained "switched" drugs at all.

Apparently this is just his assumption because of the atypical form or dosage, but the assumption is not supported by evidence any or all of the medications were originally prescribed in a different form or strength. Lisitza, unlike Lamers, did not uncover independently facts showing that Par caused a fraud. Manufacturing and distributing generic drugs is not unlawful, even in non-standard dosages or formats; that is all that Lisitza knew that Par did, though.

Further, any information he had related to the treatments dispensed to patients; he knew nothing of the pharmacies' billing practices or any financial arrangements with Par—but the money, not the medicine, is at the heart of the alleged fraud scheme. *See Glaser*, 570 F.3d at 921-22. In *Glaser,* the relator alleged that Medicaid and Medicaid were defrauded by a medical facility's improper use of provider codes in its reimbursement claims; the Court held that she was not an original source because she had not shown that she had "independent" knowledge of the provider's *billing practices*. *Id*. The same is true here. Any independent knowledge Lisitza had of Par related to the drugs it supplied—he was in no position to learn about the way those drugs were billed, let alone to know that the higher reimbursements were a centerpiece of Par's marketing of the subject drugs. His complaint could assert fraud only because his prior lawsuits described the billing scheme and the government investigation of Walgreens revealed facts about Par's marketing practices and communications with the pharmacies—information Lisitza was in no position to know directly or to obtain independently. Therefore, Lisitza has not shown that "compelling" evidence against Par "could only have come from" him. *See Leveski*, 719 F.3d at 837. Instead, he is "claim smuggling" based on his prior complaints, repeating the same allegations and adding allegations about Par's participation that did not originate with him.

Lisitza admits that he did not in fact obtain or even read the documents that lend plausibility to the fraudulent billing claim against Par even as he attached them to his amended

complaints. Rather, the record shows that information that Par might have developed and marketed its drugs for the purpose of evading reimbursement caps was obtained by the government and relayed to Par's lawyer. For example, Lisitza had no access to communications between Par and Walgreens. *Glaser* suggests that when the knowledge of a firm's unlawful conduct "comes from [relator's] attorney," the relator is not the original source. *See* 570 F.3d at 921.[22] Moreover, as previously noted, if, as occurred here, conclusory allegations without specific facts to support them were later bolstered by evidence obtained by the government, the relator cannot profit. *See* n.2, *supra*.

True, Lisitza had previously developed, and related to the government, a suspicion that "the manufacturers" including Par might be involved in the pharmacies' scheme. But identifying that some or all firms in an industry may use a given practice is a far cry from providing defendant-specific facts, as did the relators in *Baltazar*, 635 F.3d at 866 (regarding a specific chiropractic practice) and *Goldberg*, 680 F.3d at 936 (regarding a specific teaching hospital). Lisitza's suspicion evolved to a "conclusion" sometime after he observed the pill bottles. Lisitza testified that he knew based on his longtime experience that certain forms and dosages of certain drugs were new, and, in his view, unnecessary based on what he knew was already on the market and mostly commonly prescribed. From there, he inferred that manufacturers were driving the process and developing new forms and strengths that cost Medicaid much more money if dispensed by a pharmacy instead of cheaper alternatives. In some cases, detecting a "hidden

---

[22] "It would be one thing to say that an FCA relator has direct knowledge of the information supporting her allegations because she is personally aware of at least one instance of fraudulent conduct and her attorney's subsequent investigation uncovers other fraudulent behavior . . . . It would be quite another to say that an FCA source has direct knowledge . . . even thought she had *no knowledge whatsoever* of the fraudulent conduct before hearing from an attorney." *Glaser*, 570 F.3d at 921 (emphasis in original). Here, Lisitza is in the "no knowledge" camp. There is no evidence that he knew of "at least one instance" of fraud by Par, despite his suspicions.

pattern" or putting existing information into perspective might constitute acting as an "original source." *Bank of Farmington*, 166 F.3d at 864. But that's when there is "an exceptionally or unusually complicated allegation of fraud." *Id*. Here, however, as in *Bank of Farmington*, "[t]his was no profound scheme." *Id*. Therefore, "putting two and two together," as both Lisitza and the relator in *Bank of Farmington* claimed they had done, was "simple arithmetic" rather than detecting some hidden pattern in a complicated scheme. *Id*. at 865. Neither relator was "Sherlock Holmes." *Id*. at 864.

Lisitza had no "direct" or "independent" knowledge of the any facts suggesting Par's participation in the fraud. The only disclosure statement in which Lisitza mentioned Par contains only speculation and states his "belief" that *the government s*hould investigate. Indeed, even in its attempt to support Lisitza, the government characterizes that disclosure statement as an articulation "*of his suspicions*" that manufacturers such as Par played a role in the scheme SOI, ECF No. 354 at 2 (emphasis added). Tellingly, this disclosure statement, like all the rest, said nothing of any past efforts or any intent *of Lisitza* to investigate the manufacturers, nor did it claim any direct knowledge. Simply telling the government that "there is a basis to be revealed eventually" for believing a defendant to be involved in fraud is not voluntarily providing the government with information. *Baltazar*, 635 F.3d at 866. Suspicions are not facts; they are not "essential information"; and they are not "critical elements" of fraud. *See Rockwell*, 549 U.S. at 475 (relator's "prediction" was not "direct and independent knowledge").

The same is true of "conclusions" of fraud that are not supported by any specific facts obtained through independent knowledge or investigation. As already explained, Lisitza's observations of the pill bottles bearing Par's name, and his single conversation with a Walgreens pharmacist (about Walgreen's practices, not Par's), which are the only sources that arguably

provided him with direct and independent information, did not reveal anything beyond Par's identity as the manufacturer. It was not necessarily or probably indicative of fraud. As previously noted, one could just have easily inferred that the pharmacies sought out Par's drugs to evade reimbursement caps, without prompting by Par. At most, it alerted Lisitza to the commercial relationship between Par and Walgreens, but this is not direct and independent knowledge that the relationship was improper. *See United States ex re. Zeibell v. Fox Valley Workforce Dev. Bd*., 806 F.3d 946 (2015). No direct knowledge or independent investigation placed Lisitza in a position to make a good-faith allegation that Par developed and marketed its drugs to effect a scheme to evade reimbursement caps.[23] *See, e.g., In Re Natural Gas Royalties*, 562 F.3d 1032, 1045 (10th Cir. 2009) (explaining that relator needs "specific facts—as opposed to mere conclusions—showing exactly how and when he or she obtained direct and independent knowledge.").

Therefore, assuming that Lisitza was the original source of the claims against the pharmacies in his prior cases (the issue was never litigated, due to settlements of the pharmacy cases, but is not disputed here), he had no comparable role in exposing Par. *See id*. (public disclosure bar applies if relator's limited direct and independent knowledge about a defendant is minimal in comparison to scope of the allegations against the defendant). Lisitza's direct knowledge of Par's actions—consisting of nothing more than knowledge that it manufactured some medications in forms and dosages that were not subject to reimbursement caps—is far eclipsed by specific facts about Par's marketing strategy, as to which he can claim no direct and

---

[23] A complaint without further factual assertions making that allegation plausible would not have survived a motion under 12(b)(6), and certainly not under Rule 9(b), which requires fraud allegations to be pleaded with particularity. It follows, therefore, that without evidence obtained in the government's Walgreens investigation (from which the Par investigation later spun off), Lisitza did not have the essential ingredients of a fraud claim.

independent knowledge. He therefore fails to qualify as an original source of the essential information and critical elements of the alleged fraud by Par.

*     *     *

The motion for summary judgment is granted. Mr. Lisitza is precluded from serving as the relator in this *qui tam* action against Par. Accordingly, judgment for Par will be entered against all plaintiffs on whose behalf Lisitza brought this case (*i.e.*, Lisitza himself, and the non-intervenor states that remain in the case, that is, the District of Columbia, and the states of Illinois, Delaware, Florida, Georgia, Louisiana, Massachusetts, Nevada, New Hampshire, New Jersey, New Mexico, New York, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, and Wisconsin). The United States, Indiana, and Michigan, retain (only) the allegations and claims lodged in their separate complaints, which will be adjudicated on the merits.

Date: August 17, 2017

John J. Tharp, Jr.
United States District Judge